# Illinois Official Reports

## Appellate Court

---

### *ICD Publications, Inc. v. Gittlitz*, 2014 IL App (1st) 133277

---

| | |
|---|---|
| Appellate Court Caption | ICD PUBLICATIONS, INC., Plaintiff and Counterdefendant-Appellee, v. IAN GITTLITZ, Defendant and Counterplaintiff-Appellant.–IAN GITTLITZ, individually and derivatively, on behalf of ICD PUBLICATIONS, INC., Plaintiff-Appellant, v. CYNTHIA EVANS and DAVID PALCEK, Defendants-Appellees. |
| District & No. | First District, First Division <br> Docket No. 1-13-3277 |
| Filed <br> Rehearing denied | December 29, 2014 <br> January 27, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 07-L-06836, 08-CH-40858; the Hon. Patrick J. Sherlock, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Ian Gittlitz, of Stony Brook, New York, *pro se*. <br><br> Dykema Gossett, PLLC, of Chicago (Jonathan S. Feld, Mark J. Magyar, and John F. Rhoades, of counsel), for appellee. |

Panel JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.
Presiding Justice Delort and Justice Harris concurred in the judgment and opinion.

**OPINION**

¶ 1     from a September 27, 2013 order of the circuit court of Cook County following a bench trial in which the court entered judgment in favor of ICD Publications, Inc. (ICD), in the amount of $9,791,840 based upon Gittlitz's breach of fiduciary duty and fraud. Gittlitz also appeals from the dismissal of his affirmative defenses and his claims against ICD alleging unjust enrichment and denial of his right to inspect ICD's corporate books and records following his termination from the company.

¶ 2                          BACKGROUND

¶ 3     ICD, an Illinois corporation which produced trade publications for the housewares industry, was founded in 1989 by Gittlitz, Cyndi Evans, and David Palcek, all of whom owned the company in equal one-third shares. Until 2007, Gittlitz served as ICD's president and chief executive officer, and Gittlitz's wife, Ellen, was employed as ICD's administrative manager. Evans and Palcek were each senior vice presidents of the corporation; Evans was also ICD's corporate secretary.

¶ 4     ICD had two main offices, one on Long Island, New York, and another in Illinois. Gittlitz and his wife worked at the New York office, where ICD's financial records were maintained. As administrative manager, Ellen Gittlitz paid ICD's bills from ICD's checking account. ICD also maintained an American Express credit card for business expenses; credit card bills were sent to ICD's New York office and were paid through ICD's checking account. Gittlitz was the only shareholder of the three who carried an ICD corporate credit card. Evans and Palcek worked out of ICD's office in Lincolnshire, Illinois, and did not have immediate access to ICD's checkbook, bank account or credit card records.

¶ 5     From at least 2001 until his termination from ICD in 2007, Gittlitz engaged in a fraudulent practice of submitting improper expense reports seeking reimbursement for business-related expenses that he falsely claimed to have incurred. In these instances, Gittlitz charged certain expenses to the ICD corporate credit card account, which were then paid for by ICD directly. Nevertheless, Gittlitz also submitted reports of these same expenses to ICD as if he had personally paid them. Through this practice of "double dipping," Gittlitz received improper "reimbursement" payments from ICD for expenses that he had not paid in the first place.

¶ 6     Apart from his expense report fraud, Gittlitz engaged in another form of embezzlement from at least October 2000 to 2007. Specifically, Gittlitz used ICD's checking account to write himself checks, including many labeled as "advances," for which he never repaid the company. Although ICD shareholders were permitted to take "advances" if they were later credited against actual, legitimate business expenses, Gittlitz simply took such "advances" for his own benefit.

¶ 7     Gittlitz's business partners, Evans and Palcek, became suspicious of his activities in early 2007. In late January or early February 2007, Evans was reviewing an expense report

submitted by Gittlitz. Coincidentally, at the same time Evans was reviewing a hotel reservation confirmation for an upcoming business-related event. Evans noticed that the last four digits of the ICD corporate credit card number on her hotel reservation matched the last four digits of the credit card number on a receipt submitted by Gittlitz for reimbursement. Evans became suspicious that Gittlitz was submitting expense reports for reimbursement of costs that had been paid through ICD's credit card.

¶ 8　　After Evans showed the documents to Palcek, they planned a meeting with Gittlitz on April 10, 2007 in Chicago. At that meeting, Palcek and Evans did not tell Gittlitz that they suspected him of committing fraud, but presented him with a letter in which they stated they were "no longer comfortable without having an internal financial reporting process in place with equal access to all information." In the letter, they requested "to be better informed of the company's financial standing *** and that a true and transparent checks and balance process be initiated." At the meeting, Evans and Palcek requested that Gittlitz provide them with ICD bank and credit card statements for the prior year. Gittlitz responded that it would be burdensome to provide the previous 12 months' worth of statements, but agreed to provide records for the two-month period of January and February 2007.

¶ 9　　In April or May 2007, Gittlitz provided to Evans and Palcek the ICD financial statements for January and February 2007. Upon review of these records, Evans and Palcek discovered that Gittlitz had falsely altered hotel receipts from another ICD employee and submitted them for reimbursement as his own expenses. The records confirmed that Gittlitz had received reimbursements for expenses that had been paid using ICD's credit card.

¶ 10　　After confirming the false expense reports, Palcek and Evans contacted an accounting firm, Manning Silverman, to discuss changing ICD's financial controls. Although they wanted to limit Gittlitz's control over the company's finances, at that time Evans and Palcek still desired that Gittlitz, their business partner of nearly 20 years, would remain as ICD's president.

¶ 11　　With the assistance of the Manning Silverman firm, Evans and Palcek drafted an agreement which would change control of the company's finances while retaining Gittlitz as president. The agreement was drafted in the form of a letter agreement from Evans and Palcek to Gittlitz with the subject heading "ICD Publications Change of Financial Controls" (the CFC agreement). The CFC agreement recited that Evans and Palcek "believe there is a need for immediate change of financial controls" as "the possibility exists that certain Shareholders may have been disenfranchised from funds properly due them." The CFC agreement stated its goal was "to effect immediate change in the financial controls of ICD that allow for its continuity."

¶ 12　　The agreement set forth numerous "Changes in Organization," including the addition of Evans and Palcek as signatories on ICD's bank and credit card accounts, as well as the transfer of accounting and bookkeeping functions from Gittlitz and his wife to the Manning Silverman firm. The agreement also called for Ellen Gittlitz to retire from ICD and stated that she would no longer be a signatory on ICD's accounts. However, the CFC agreement specified that Ian Gittlitz was to "retain[ ] all other duties as President" of the company.

¶ 13　　Following the proposed changes, under the heading "Restitution," the document specified that Evans and Palcek would "appoint an independent auditor to determine the amount of restitution owed by [Gittlitz]." Furthermore, under the heading "Confidentiality," the document stated that: "Cyndi [Evans] and Dave [Palcek] agree not to seek legal remedies, either criminally or civilly, nor involve the IRS in any findings as it specifically relates to the

misuse of company funds provided restitution is made." The CFC agreement also provided that the matter "w[ould] not be discussed outside of the Shareholders" and their advisors.

¶ 14     Evans and Palcek scheduled a meeting with Gittlitz on May 7, 2007, when all three would be in Orlando, Florida, to attend an industry trade show. Evans and Palcek did not notify Gittlitz about their suspicions or the CFC agreement before the meeting, and both testified that they did not sign the agreement prior to the meeting.

¶ 15     Evans and Palcek questioned Gittlitz at the May 7, 2007 meeting regarding the accuracy of his expense reports. Initially, Gittlitz denied any wrongdoing. However, after Evans and Palcek showed him documents proving that he had altered a receipt from another ICD employee, Gittlitz became emotional and admitted to falsifying the receipt. According to Palcek's and Evans' trial testimony, Gittlitz expressed remorse and claimed that this fraud "ha[d]n't been going on for that long" and that it "hasn't [involved] a lot of money." Evans testified: "Ian convinced us at that moment that this was a short period of time, was a limited amount of money." Although Gittlitz admitted to submitting invalid expense reports at that meeting, he did not disclose to Evans or Palcek that he had also been embezzling from ICD by writing himself "advance" checks for many years.

¶ 16     Palcek and Evans showed Gittlitz the CFC agreement they had drafted. Evans testified that she told Gittlitz that "if you agree to this, then we'll move on," as "we wanted to keep [Gittlitz]. We did not want to disrupt the company." Evans and Palcek signed the agreement at the meeting. Gittlitz did not sign immediately, but asked to return it the next day after speaking with his wife. The following day, May 8, 2007, Gittlitz met with Evans and signed the CFC agreement. At that time, he again told Evans that his misconduct had not involved a great deal of money and had been for a "short period of time."

¶ 17     After the meeting with Gittlitz, and pursuant to the CFC agreement, Evans and Palcek hired the accounting firm Lasko and Associates (Lasko) to conduct an audit to determine the amounts that Gittlitz owed ICD. To further the audit, Lasko informed Evans that she could request access to ICD's bank records in her capacity as secretary of the corporation. Evans called ICD's bank and requested a copy of ICD's file. The bank initially denied Evans' request, as its records indicated that Ellen Gittlitz, not Evans, was ICD's corporate secretary. Surprised, Evans faxed to the bank a board resolution that identified her as ICD's corporate secretary. The bank eventually provided Evans with ICD's file in early June 2007.

¶ 18     Upon reviewing the bank file, Evans and Palcek were astonished to find that it contained a purported account signature card that falsely listed Ellen Gittlitz, rather than Evans, as the corporate secretary, and that Evans and Palcek had been removed as signatories on ICD's bank account. In addition, the file contained a fraudulent ICD corporate resolution, dated November 2006, which falsely listed Ellen Gittlitz as ICD's corporate secretary, incorrectly stated ICD was a New York rather than an Illinois corporation, and recited a purported July 1999 board of directors meeting that had never occurred. These items had never been mentioned by Gittlitz to either Evans or Palcek.

¶ 19     In addition, the bank records also showed that, in March 2007 alone, Gittlitz had written to himself over $80,000 in checks from ICD's checking account, most of which were labeled as "advances," with no record of repayment to ICD. The bank records revealed that since at least October 2000, Gittlitz had paid himself more than one million dollars in such "advances."

¶ 20     Gittlitz, Evans, and Palcek next met on June 21, 2007. At that meeting, Gittlitz revealed that he intended to purchase a company known as Travel Trade, which he described as a

"production" company. Gittlitz told Evans and Palcek that in order to work on the Travel Trade purchase, he wished to change his role at ICD from president to "chairman" of the company and would agree to a reduced salary. He had not previously mentioned Travel Trade to Evans or Palcek. Upon further questioning about Travel Trade, Gittlitz admitted to Evans and Palcek that the company was, like ICD, a business-to-business publication company. Evans and Palcek subsequently learned that Gittlitz had been negotiating the Travel Trade transaction for several months. Although Gittlitz had learned of the Travel Trade opportunity in his capacity as ICD's president, he had not previously disclosed the potential opportunity to Evans or Palcek.

¶ 21　　After the June 21, 2007 meeting, Evans and Palcek concluded they had cause to terminate Gittlitz from ICD based on fraud, embezzlement, and their belief that he had usurped the Travel Trade opportunity to the detriment of ICD. Through a corporate resolution dated July 2, 2007 signed by Evans and Palcek, ICD terminated Gittlitz for cause, citing that Gittlitz "committed various acts involving dishonesty or fraud with respect to [ICD] including *** submitting and approving false expense reports, utilizing corporate funds to pay personal expenses," "usurping corporate opportunities," and "presenting false statements and corporate resolutions to the corporation's bank." Also on July 2, 2007, ICD filed a complaint against Gittlitz in the circuit court of Cook County. That complaint alleged counts of: (1) breach of fiduciary duty; (2) usurpation of corporate opportunity; (3) corporate computer misuse; (4) misuse of personnel; and (5) fraud.

¶ 22　　On July 10, 2007, through another ICD corporate resolution signed by Palcek and Evans, they elected to purchase Gittlitz's shares in the company on an involuntary basis. The resolution cited the "Amended and Restated Shareholders' Agreement of ICD Publications, Inc.," dated May 20, 2003 (shareholders agreement), which specifies that ICD has the right to repurchase a terminated employee's shares at "book value."[1] The ICD resolution scheduled a closing of the transaction for September 10, 2007. On July 18, 2007, Gittlitz, through his legal counsel, advised ICD that he "contest[ed] the validity of the Board Resolutions setting up this sale." At the same time, Gittlitz demanded to inspect ICD's corporate books and records, including all records related to ICD's lawsuit against him. As Gittlitz refused to transfer his shares, ICD subsequently amended its complaint to add a count seeking specific performance of the stock repurchase terms of the shareholders agreement.

¶ 23　　On March 17, 2008, Gittlitz answered the amended complaint and also asserted various affirmative defenses and counterclaims. In those and subsequent pleadings, Gittlitz claimed that the CFC agreement constituted a binding settlement and release, and that Evans and Palcek had breached this contract by suing Gittlitz and failing to keep the matter confidential. On June 16, 2008, Gittlitz filed amended counterclaims against ICD and an amended third-party complaint against Evans and Palcek, which asserted that Gittlitz had been denied his statutory right as a shareholder to inspect ICD's books and records after his termination. On August 1, 2008, Gittlitz filed an amended verified counterclaim which added a claim of

---

[1]The shareholders agreement specified that if a shareholder ceased to be an ICD employee, "the Corporation and the other Shareholders shall have the same successive rights, to purchase all or any part of the Shares from such Shareholder, or any transferee as they would have had to purchase such Shares *** in a voluntary transfer," "except that *** the purchase price for such Shares shall be the Book Value of the Shares." Separate provisions describe the calculation of "book value," although the parties do not dispute that the applicable "book value" in this instance is essentially zero dollars.

"anticipatory breach of contract" with respect to the shareholders agreement, claiming that ICD was not entitled to buy back his shares for "book value."

¶ 24　　On October 29, 2008, Gittlitz filed a separate complaint instituting a new case, pleaded as a purported derivative action "on behalf of ICD" against Evans and Palcek. That pleading alleged that Evans and Palcek had committed breaches of fiduciary duty, fraud, and other torts arising out of the CFC agreement, Gittlitz's termination, and ICD's attempt to repurchase his stock. That separate action was later consolidated with ICD's initial lawsuit against Gittlitz.

¶ 25　　On March 9, 2011, Gittlitz filed yet another counterclaim alleging his entitlement to his share of undistributed profits retained by ICD. In that pleading, Gittlitz alleged that ICD became a subchapter S corporation under the Internal Revenue Code in 2000 and that he had since paid taxes on his one-third share of ICD's taxable income, although such amounts had not been distributed to him. He alleged that his portion of undistributed ICD profits totaled more than $1 million. Gittlitz further claimed that the three shareholders "orally agreed to leave the three individuals' monies in the corporation but each of them could require payment of their monies upon demand," and that every year the agreement was renewed by telephonic meetings. Gittlitz thus claimed ICD had deprived him of his share of undistributed ICD funds. The counterclaim pleaded breach of contract against ICD, Evans, and Palcek, as well as "unjust enrichment" against ICD for its retention of the funds.

¶ 26　　The same pleading also asserted two new affirmative defenses. First, Gittlitz argued that the provision of the shareholders agreement allowing ICD to purchase Gittlitz's shares of the company at "book value" was an "unenforceable penalty." Second, Gittlitz asserted that the election of remedies doctrine precluded ICD from recovering monetary damages as well as obtaining specific performance of the stock repurchase provisions.

¶ 27　　Pending this civil proceeding, in 2009 Gittlitz was arrested and indicted in Lake County, Illinois for committing theft against ICD. See 720 ILCS 5/16-1(a)(1)(A) (West 2008). On October 6, 2011, Gittlitz pleaded guilty to one count of Class 3 felony mail fraud with respect to his submission of fraudulent expense reports. See 720 ILCS 5/17-24(b)(1) (West 2010). That plea specified that between October 2001 and June 2007, Gittlitz "submitted by mail personal expense reports for reimbursement *** knowing such expense reports to be fraudulent" and that he received reimbursement when he "knew these same expenses had been previously paid for with an ICD Publications American Express credit card" and that he "did so with the intent to defraud [ICD's] officers and shareholders." In conjunction with that plea, Gittlitz admitted that he had stolen $250,000, and he paid restitution in that amount to compensate ICD. Notably, his embezzlement through the writing of illegitimate "advances" to himself from the ICD account was not referenced in that criminal plea.

¶ 28　　On November 3, 2011, the trial court in this action dismissed counts I through V of Gittlitz's purported derivative complaint against Evans and Palcek and the first four counts of his amended counterclaims against ICD, including his counterclaims for breach of the CFC agreement and anticipatory breach of the shareholders agreement.

¶ 29　　On December 22, 2011, ICD moved for partial summary judgment to establish Gittlitz's liability with respect to ICD's counts of breach of fiduciary duty, common law fraud, and specific performance. At the same time, ICD moved for summary judgment to dismiss those counts of Gittlitz's counterclaim and derivative complaint regarding ICD's alleged refusal to allow his inspection of corporate books and records. ICD also moved for summary judgment with respect to Gittlitz's affirmative defense asserting a "release" in the CFC agreement.

¶ 30     On July 3, 2012, the trial court granted summary judgment in favor of ICD with respect to the counts of breach of fiduciary duty and fraud. However, the court found that trial was necessary to determine remaining "issues of reasonable reliance regarding misrepresentations" surrounding the parties' entry into the CFC agreement, as well to determine damages. The July 3, 2012 order also granted ICD's summary judgment motion to dismiss Gittlitz's claims that ICD wrongfully denied his right as a shareholder to inspect corporate books and records. However, Gittlitz's additional counterclaim for unjust enrichment regarding his share of undistributed ICD corporate profits remained.

¶ 31     On August 17, 2012, the trial court entered an order finding–contrary to Gittlitz's contention that an earlier employment agreement entitled him to "market value" for his shares of stock–"that the 2003 Shareholders' Agreement provision for the repurchase of shares at Book Value" governed ICD's count seeking specific performance. On September 28, 2012, the court granted summary judgment for ICD on that count, finding that Gittlitz breached the shareholders agreement by refusing to transfer his shares, and thus ordered specific performance for the transfer of his stock back to ICD for "book value." At the same time, the court rejected Gittlitz's defense that the repurchase provisions of the shareholders agreement constituted an "unenforceable penalty."

¶ 32     After further motion practice, trial was scheduled for July 22, 2013. On July 9, 2013, Gittlitz filed an emergency motion to postpone the trial date, submitting a letter from his physician in New York stating that he had been diagnosed with lymphedema, or swelling of the extremities, as a complication of "right axillary cancer." The letter stated that Gittlitz had "noticed an increase in swelling during [a] flight" and that "Mr. Gittlitz won't be able to fly until September." ICD opposed the motion, arguing that Gittlitz could find an alternate form of transportation to travel to Chicago. Gittlitz's motion was denied on July 10, 2013.

¶ 33     The action proceeded to trial on July 22-25, 2013. On behalf of ICD, Palcek and Evans each testified that, although they knew prior to the May 7, 2007 meeting that Gittlitz had submitted fraudulent expense reports, they had relied on his statements at the meeting that the fraud had been for a short period of time and had not involved a lot of money. Both testified that they would not have offered the CFC agreement to Gittlitz had they known the true extent of his fraud over several years. Evans testified she had believed him because "if he signed the agreement, he must have not stolen too much, because he wouldn't be signing this agreement otherwise." Palcek likewise testified that he placed "enormous reliance" on Gittlitz's statements that his misconduct had occurred for only a short time.

¶ 34     On the issue of damages, the trial court admitted the expert report and testimony of ICD's expert witness Matthew Bialecki, a certified public accountant. Bialecki testified that he had calculated the amounts Gittlitz received through "unsupported checks" from ICD, including "advances" written to himself, for the years 2000 through 2007, and that these checks totaled $1,220,623. Bialecki also testified that by reviewing tax returns, he had calculated that the ICD compensation received by Gittlitz from 2001 through 2007 totaled $6,021,657. This amount consisted of wages in the amount of $5,412,384 as well as corporate distributions of $609,273.

¶ 35     At the conclusion of ICD's case, upon Gittlitz's motion, the court entered a directed verdict for Gittlitz with respect to ICD's claim that Gittlitz usurped a corporate opportunity with respect to the Travel Trade transaction. The court also dismissed ICD's counts alleging computer misuse and misuse of personnel.

¶ 36     Gittlitz testified on his own behalf at trial and admitted he embezzled funds from 2001 through 2007. Gittlitz admitted that he had stolen $250,000 though submission of false

expense reports and had pled guilty to mail fraud. Gittlitz also admitted that he embezzled by writing "advance" checks to himself from ICD's account. Gittlitz did not dispute that these checks totaled $1,220,623, as calculated by ICD's expert, and admitted that this amount was still owed to ICD. He admitted that he intentionally defrauded Evans and Palcek and violated his duties to them. Gittlitz conceded that he never disclosed his fraud to either Evans or Palcek, although he repeatedly insisted that they "could have asked any questions they wanted" and "could have come to New York if they wanted to look at any records."

¶ 37    Gittlitz recalled the May 7, 2007 meeting where Evans and Palcek confronted him about his fraudulent expense reports. He recalled that he "got emotional" and admitted his wrongdoing at that meeting. However, Gittlitz's account of the meeting differed from that of Evans and Palcek. In particular, he testified that Evans and Palcek had already signed the CFC agreement when they presented it to him. He also claimed that Evans and Palcek demanded that he had to sign the agreement within 24 hours and told him he could not consult an attorney. Gittlitz also testified he "congratulated" Evans and Palcek when they showed him the CFC agreement as he "thought they did a really good job on" it, but told them "the only part where they did something that was wrong was letting my wife retire, letting her go." He testified that he met with Evans and signed the agreement the next day, but did not testify that he ever told Evans or Palcek that his fraud was for a limited amount of money or a short period of time.

¶ 38    In support of his unjust enrichment counterclaim, Gittlitz also testified regarding the undistributed ICD earnings that he claimed were owed to him. He testified that his understanding of his right to the undistributed funds was supported by a footnote within ICD's consolidated financial statements for the years 2005 and 2006, prepared by an outside accounting firm. The footnote stated that since ICD was an S corporation under the Internal Revenue Code, "[i]n lieu of corporate income taxes, the shareholders of an S corporation are taxed on their proportional share of the Company's taxable income. *** Undistributed S corporation earnings of approximately $2,938,000 at December 31, 2006 may be distributed to the stockholders without further tax consequences." Gittlitz testified that he, Evans and Palcek had discussed the footnote and agreed that it referred to "undistributed distributions or dividends from the company available to all three of us personally," and that each shareholder "was entitled to the money." Gittlitz testified that through telephonic meetings, he and the other shareholders had agreed that each could claim his or her share of these retained funds and "take it at any time."

¶ 39    Following Gittlitz's testimony, ICD recalled Palcek to testify as a rebuttal witness regarding Gittlitz's counterclaim. Regarding the footnote in ICD's financial statements, Palcek testified: "It's simply a footnote regarding tax consequences of undistributed S corp[oration] earnings or also referred to as retained earnings." Palcek testified that, notwithstanding the $2,938,000 figure in the footnote, this did not mean the company had "an account with 2.9 million dollars in it waiting to be distributed," as there was actually much less cash available in the company, about $600,000, at the time. Thus, Palcek stated that such distributions were "not even realistic, could not even happen." He elaborated that "if this conversation supposedly took place and somebody said I want 250,000 today, which would be interesting because you now have one shareholder overruling the other two, the company could not satisfy that because it didn't have the cash." Although he acknowledged the shareholders had discussed the undistributed earnings described in the footnote, Palcek testified that "we didn't have an annual conversation like Mr. Gittlitz said that any one of us could demand any amount at any time."

¶ 40    At the conclusion of trial, the court requested the parties prepare posttrial findings of fact and conclusions of law by August 30, 2013. The record indicates Gittlitz's posttrial submission was filed on that date. On September 20, 2013, the trial court issued an order and opinion, which included a note that Gittlitz had not submitted a posttrial brief. Gittlitz responded by filing an emergency motion stating that he had, in fact, filed a timely posttrial brief. In response, the trial court vacated the September 20, 2013 order to allow an opportunity to review Gittlitz's posttrial submission. On September 27, 2013, the trial court issued a new order whose findings and conclusions were substantially identical to those contained in the vacated order.

¶ 41    As Gittlitz's liability for breach of fiduciary duty and fraud had already been established upon summary judgment, the posttrial order addressed the amount of damages, Gittlitz's affirmative defenses, and Gittlitz's unjust enrichment counterclaim. With respect to damages, the trial court first concluded that ICD could recover forfeited compensation "for the entire period during which he was breaching his fiduciary duties." The court noted that Gittlitz, by his own admission, engaged in his "double dipping" expense report scheme from at least October 2001 through June 2007, and had written himself improper "advance" checks from "October 2000 through at least April 2007."

¶ 42    The court found that "Gittlitz's guilty plea, as a fiduciary, is evidence of his willful, deliberate, and repeated breaches of his fiduciary duty that justifies the complete forfeiture of his compensation from January 1, 2001 through June of 2007." The court found that Gittlitz's compensation for this period totaled $6,021,657 (as calculated by ICD's expert witness), and ordered forfeiture of this full amount. In addition to the forfeiture of compensation, the trial court found that damages should include the "amount of money that Gittlitz misappropriated from ICD," which was not disputed to be $1,220,623, as calculated by ICD's expert witness. The court also found ICD was entitled to interest on that sum in the amount of $549,560.

¶ 43    The court then noted that "[p]unitive damages and forfeiture damages are not mutually exclusive remedies, and both may be awarded for a defendant's intentional breach of a fiduciary duty." The court found that Gittlitz had breached his "duty of honesty" to Evans and Palcek "continuously over an almost seven-year period" and that he "h[i]d his nefarious conduct from his business partners." The court found that "Gittlitz's conduct was calculated, planned and intentional" and, concluding that "this type of conduct should be punished," imposed punitive damages in the amount of $2,000,000. The court thus entered judgment in ICD's favor in the total amount of $9,791,840.

¶ 44    Turning to Gittlitz's affirmative defense of "release," the court addressed the argument that ICD's suit was barred by the statement in the CFC agreement that Evans and Palcek agreed "not to seek legal remedies, either civilly or criminally *** provided restitution is made." The court reasoned that "a settlement agreement amongst parties in a fiduciary relationship will be voidable if a fiduciary fails to fully disclose material facts upon entering the agreement." The court found that Gittlitz's "failure to disclose fully his misconduct makes the CFC Agreement voidable" by ICD, and that "ICD validly elected to repudiate the contract." The court explained that "[c]ontrary to Gittlitz's statement that his defalcations had been for a short period of time and a small amount of money," ICD had subsequently learned that Gittlitz had submitted fraudulent documents to ICD's bank and had "lied about the scope and duration of his embezzlement." The court thus concluded the CFC agreement was voidable. The court further reasoned that, even if the language of the CFC agreement constituted a release, "it does

not apply to the years of [Gittlitz's] embezzlement that he did not disclose to Evans or Palcek," under the principle that "[g]eneral terms of release do not apply to unknown claims."

¶ 45      The court next rejected Gittlitz's affirmative defense that the stock repurchase provision of the shareholders agreement constituted an unenforceable penalty. The court noted that Gittlitz cited no authority to dispute the agreement's enforceability and, "[a]s it was included in the [Shareholders] Agreement and signed by the parties, the Court infers that it was bargained for" and enforceable. The court concluded that the company's purchase of Gittlitz's stock at "book value" was "a contractually bargained for transaction, not a penalty."

¶ 46      The court also rejected Gittlitz's argument that, under the election of remedies doctrine, ICD was foreclosed from obtaining monetary damages in addition to specific performance of the stock repurchase. The court held the monetary damages and stock buyout in this case did not arise from the same breach, but explained that the monetary award arose from Gittlitz's breach of fiduciary duty, whereas the remedy of specific performance arose from Gittlitz's separate breach of the shareholders agreement.

¶ 47      Finally, the court dismissed Gittlitz's counterclaim for unjust enrichment, noting the claim was premised on his assertion that "a contract existed between ICD's shareholders whereby any shareholder could demand payment of their proportional share of [ICD's] retained earnings." The court found that Gittlitz "failed to prove the existence" of such an agreement and thus "[f]ailed to meet his burden of proof on his counterclaim."

¶ 48      Gittlitz filed a timely notice of appeal on October 13, 2013; accordingly, we have jurisdiction. His appeal seeks reversal of numerous orders, including the orders granting summary judgment in favor of ICD on its claims of breach of fiduciary duty, fraud, and specific performance of the shareholders agreement, as well as the findings of fact and conclusions of law of the September 27, 2013 posttrial order.

¶ 49                         ANALYSIS

¶ 50      Gittlitz's argument on appeal does not contest that he committed fraud or breached his fiduciary duties, but asserts numerous errors in the trial court's assessment of damages and rejection of his affirmative defenses and counterclaims. He challenges the assessment of forfeiture of compensation and assessment of $2 million in punitive damages. He also asserts the court erred in rejecting his affirmative defense that the CFC agreement released ICD's claims and precluded its lawsuit. With respect to the order of specific performance for ICD's repurchase of his stock, Gittlitz disputes that the shareholders agreement controls, argues the stock repurchase at "book value" is an unenforceable penalty, and claims that the order violates the election of remedies doctrine. With respect to his counterclaim of unjust enrichment, Gittlitz maintains that he is entitled to over $1 million due to ICD's retention of his share of undistributed profits.

¶ 51      Apart from the findings of the September 27, 2013 order, Gittlitz also challenges the earlier dismissal of his claim that ICD violated his right to inspect ICD's books and records. Gittlitz also contends that the court improperly declined to grant his emergency motion to postpone trial, and that the court erroneously found his testimony not credible on the basis of speech difficulties related to a 2009 stroke. He also claims error since the court, after initially issuing an order stating that Gittlitz had not filed a posttrial brief, entered a new order one week later whose content was largely identical.

¶ 52    Before we examine the specific challenges to the trial court's rulings, we first note that, with respect to the court's findings of fact, "[t]he standard of review in a bench trial is whether the trial court's judgment is against the manifest weight of the evidence," which occurs "only if the opposite conclusion is apparent or if the finding appears to be arbitrary, unreasonable, or not based on the evidence." *Martinez v. River Park Place, LLC*, 2012 IL App (1st) 111478, ¶ 14. "Under this standard of review, we give great deference to the circuit court's credibility determinations and we will not substitute our judgment for that of the circuit court because the fact finder is in the best position to evaluate the conduct and demeanor of the witnesses." (Internal quotation marks omitted.) *Staes & Scallan, P.C. v. Orlich*, 2012 IL App (1st) 112974, ¶ 35. Thus, "[w]e will not disturb the findings and judgment of the trier of fact if there is any evidence in the record to support such findings." (Internal quotation marks omitted.) *Id.*

¶ 53    We turn to the trial court's finding that Gittlitz should forfeit all compensation from the years in which he embezzled funds from ICD. We note this is a matter of the trial court's discretion, as "when one breaches a fiduciary duty to a principal the appropriate remedy is within the equitable discretion of the court." *In re Marriage of Pagano*, 154 Ill. 2d 174, 190 (1992) ("While the breach may be so egregious as to require the forfeiture of compensation by the fiduciary as a matter of public policy [citation], such will not always be the case.").

¶ 54    "Illinois law permits a complete forfeiture of any salary paid by a corporation to its fiduciary during a time when the fiduciary was breaching his duty to the corporation." *Levy v. Markal Sales Corp.*, 268 Ill. App. 3d 355, 373 (1994). "The purpose of ordering forfeiture of a fiduciary's compensation earned during the period of a breach is not to compensate the injured party but rather to deprive the wrongdoer of the gains from the breach of duty and to deter disloyalty. [Citation.] It lies within the equitable discretion of the trial court to determine the appropriate remedy for breach of a fiduciary duty." *Tully v. McLean*, 409 Ill. App. 3d 659, 681 (2011).

¶ 55    On appeal, Gittlitz does not dispute that forfeiture is permissible under Illinois law, but argues that the court erred in determining the compensation subject to forfeiture. Gittlitz complains that the trial court accepted ICD's calculation of his compensation at "face value" and awarded forfeiture of his gross compensation of salary and commissions, without any deductions. He argues that the trial court's award "charges Gittlitz for compensation he never received" because it was not reduced to reflect amounts withheld from his wages for federal and state income taxes and undistributed corporate dividends. He also argues that the portion of his compensation representing commissions which were not regular "salary" should not be included in the forfeiture award. Further, he claims that he should not be required to forfeit any compensation for the years 2001, 2002, and 2003 based on the fact that his expense reports for those years were not located. After all deductions he believes he is entitled to, Gittlitz's appeal submits a new forfeiture total of $164,838, a small fraction of that awarded by the trial court.

¶ 56    Gittlitz cites no authorities supporting his argument that a forfeiture award cannot be gross compensation and must reflect deductions. Illinois case law has permitted forfeiture of all compensation, without specifying whether that amount is to be calculated before or after withheld taxes or whether such amounts include corporate distributions or "commissions" as well as salary. We see no compelling reason to carve out new exceptions to reduce such damages, especially as the purpose of forfeiture is not compensatory but "to deprive the wrongdoer of the gains from the breach of duty and to deter disloyalty" by fiduciaries. *Tully*, 409 Ill. App. 3d at 681.

¶ 57    Moreover, we will not overturn a trial court's determination regarding damages as contrary to the manifest weight of the evidence if there is "evidence in the record to support the judgment amount." *Staes & Scallan, P.C.*, 2012 IL App (1st) 112974, ¶ 37. In this case, Bialecki's expert report and testimony provided evidence to support the court's finding on the amount of compensation subject to forfeiture. Gittlitz attacks Bialecki's conclusions due to the unavailability of Gittlitz's ICD expense reports for certain years. However, Bialecki testified that his calculations of wages and distributions were based on tax records for Gittlitz and ICD. Thus, the missing expense reports were irrelevant to the question of Gittlitz's compensation.[2]

¶ 58    Apart from the initial calculation of compensation earned, Gittlitz argues that the trial court should not have ordered a complete forfeiture of that compensation. In *Pagano*, our supreme court recognized that "[w]hile the breach may be so egregious as to require the forfeiture of compensation by the fiduciary as a matter of public policy [citation], such will not always be the case." *Pagano*, 154 Ill. 2d at 190. However, we have held that " '[a] willful and deliberate breach of a fiduciary duty requires complete forfeiture of all compensation during the period of the breach.' " *Tully*, 409 Ill. App. 3d at 681 (quoting *LID Associates v. Dolan*, 324 Ill. App. 3d 1047, 1071 (2001)). In this case, we cannot find error in the court's determination that Gittlitz's breach was willful and deliberate, warranting complete forfeiture of compensation. The court's findings were certainly not against the weight of the evidence; to the contrary, the severity of Gittlitz's breach was well established and indeed undisputed. Although the trial court found that Gittlitz had contributed to ICD's success, Gittlitz engaged in deliberate fraud that spanned several years and actively concealed that fraud from his fellow shareholders through the creation of false documents, including a fake corporate resolution. The trial court also properly cited Gittlitz's guilty plea as "evidence of his willful deliberate, and repeated breaches of his fiduciary duty," and Gittlitz at trial admitted that, through improper expense reports totaling $250,000 and fraudulent "advance" payments to himself totaling $1.2 million, he embezzled from the corporation over the course of several years. Given this evidence, as well as forfeiture's function to deter breaches of fiduciary duty (*Tully*, 409 Ill. App. 3d at 681), the trial court was well within its equitable discretion in determining that Gittlitz's misconduct warranted the complete forfeiture of his ICD compensation.

¶ 59    We also find no error with respect to the $2 million award of punitive damages. "[P]unitive damages are available as a matter of law for a breach of fiduciary duty." *Tully*, 409 Ill. App. 3d at 670. The factual question of whether the defendant's conduct was of a character warranting punitive damages is reviewed under a deferential standard. "We review the court's factual determination that defendants acted willfully and that aggravating factors exist under the manifest-weight standard of review." *Id.* "In applying this standard, we give deference to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and the witnesses." *Id.* Apart from the factual findings regarding the nature of defendant's conduct, "[w]e review the court's determination that punitive damages should be awarded under the abuse of discretion standard. [Citation.] An abuse of discretion occurs where no reasonable person would agree with the position adopted by the trial court." (Internal quotation marks omitted.) *Id.* at 672.

---

[2]Moreover, although Bialecki acknowledged certain expense reports were not available to assist his calculation of the amounts Gittlitz embezzled through writing "advances" to himself from ICD funds, Gittlitz admitted at trial that he embezzled the approximately $1.2 million sum calculated by Bialecki.

¶ 60 Gittlitz's appeal presents no valid argument to reverse the punitive damages award. Gittlitz's brief recites that he pled guilty to felony mail fraud in 2010 and paid $250,000 in restitution to ICD. He thus argues punitive damages "are not appropriate" as he "satisfied all criminal damages he was asked to pay." He also argues that since the court "properly entered a directed verdict on ICD's claim that Gittlitz usurped its alleged Travel Trade opportunity, its factual underpinnings cannot support" a punitive damage award.

¶ 61 Gittlitz's arguments are without merit. First, Gittlitz cites no authority for his suggestion that his payment of $250,000 in conjunction with his guilty plea in the criminal case precludes the assessment of punitive damages in this case. Moreover, it is not disputed that the payment of $250,000 represented *restitution* to compensate ICD for the funds embezzled through false expense reports. Further, the guilty plea pertained only to Gittlitz's fraud with respect to expense reports; it was not based upon his additional $1.2 million embezzlement through improper issuance of checks. Thus, the guilty plea and related restitution payment is no bar to punitive damages in the civil case.

¶ 62 It is also apparent that in awarding punitive damages, the trial court did not rely on Gittlitz's alleged usurpation of the Travel Trade opportunity. Rather, the trial court plainly relied on the undisputed embezzlement. The trial court's findings that Gittlitz's conduct was "calculated, planned and intentional" were amply supported by the evidence, most notably Gittlitz's admissions. Likewise, given the scope and duration of the fraud, we cannot say that "no reasonable person" would agree with the decision to impose punitive damages; thus, we cannot conclude that the trial court abused its discretion. *Tully*, 409 Ill. App. 3d at 672.

¶ 63 We also decline to find any error with respect to the amount of the $2 million punitive damages award. "We review the court's computation of the punitive damages award to determine whether the amount was excessive or the result of passion, partiality, or corruption. [Citation.] The amount of the award should be a reflection of the court's determination as to the degree of maliciousness evidenced by defendants' actions." *Id.* at 673. Notably, in *Tully* we held that an award of punitive damages on a 3:1 ratio to actual damages was not excessive "given the extreme level of misbehavior and defendants' attitude toward that misbehavior." *Id.* In this case, we cannot say that the assessment of punitive damages in the amount of $2 million was excessive. This amount constitutes less than a 2:1 ratio of punitive to actual damages, in light of the roughly $1.2 million embezzled through Gittlitz's check-writing scheme. The ratio is closer to 1:1 if we also consider either the court's award of $549,560 in prejudgment interest, or the $250,000 previously paid in restitution for Gittlitz's expense report fraud. Here, the trial court emphasized the severity of Gittlitz's wrongdoing over an almost seven-year period while concealing his "nefarious conduct from his longtime business partners." Considering the degree of maliciousness found by the trial court, we cannot conclude that the amount of punitive damages here was erroneous.

¶ 64 We next turn to the trial court's rejection of Gittlitz's affirmative defenses. First, Gittlitz contends that the CFC agreement operated as a release which barred ICD's lawsuit against him. Gittlitz relies on the statement in that document that Evans and Palcek "agree not to seek legal remedies, either criminally or civilly, nor involve the IRS in any findings as it specifically relates to the misuse of company funds provided restitution is made."

¶ 65 "A release is a contract whereby a party abandons a claim to the person against whom the claim exists." *Cwikla v. Sheir*, 345 Ill. App. 3d 23, 33 (2003). "Parties in a fiduciary relationship owe one another a duty of full disclosure of material facts when making a settlement and obtaining a release. [Citation.] Therefore, a severance agreement arising out of

- 13 -

a fiduciary relationship is voidable if one party withheld facts that were material to the agreement." *Id.*; *Golden v. McDermott, Will & Emery*, 299 Ill. App. 3d 982, 988 (1998) ("If MWE had withheld material facts, it would have made the release voidable."). "A withheld fact is material if plaintiff would have acted differently had he been aware of the withheld fact." *Cwikla*, 345 Ill. App. 3d at 33.

¶ 66    Gittlitz, as president and shareholder of ICD, undoubtedly owed fiduciary duties to his fellow shareholders, Evans and Palcek. "[I]t is undisputed that the individuals who control corporations owe a fiduciary duty to their corporation and its shareholders." (Internal quotation marks omitted.) *Levy v. Markal Sales Corp.*, 268 Ill. App. 3d 355, 364 (1994). Thus, the trial court correctly recognized that the CFC agreement, even if construed as a release, would be voidable if Gittlitz withheld facts that were material to the agreement. In this case, the trial court found credible the testimony that, prior to the entry of the CFC agreement in May 2007, Gittlitz had assured Evans and Palcek that his fraudulent activity had occurred for only a short period and involved a small amount of money. Evans and Palcek testified that they relied heavily on those statements and would not have entered into the CFC agreement with Gittlitz if they knew the true scope of his fraud; thus the trial court could conclude that the information withheld by Gittlitz was "material." Accordingly, the court correctly recognized that the CFC agreement was voidable by Evans and Palcek when they learned that Gittlitz had failed to disclose material facts–specifically, that he had stolen significantly more than his partners thought over a long period of time, contrary to what he told them. As the agreement was made voidable by his concealment, Gittlitz cannot complain that Evans and Palcek breached its release by initiating legal action.[3]

¶ 67    Gittlitz argues on appeal that Evans and Palcek could not have been fraudulently induced into entering the CFC agreement because they could not have justifiably relied on his misrepresentations or concealment. Gittlitz cites cases discussing the reliance element of a fraud claim and the proposition that a plaintiff may not establish reliance if he or she had an opportunity to ascertain the truth of the matter. See, *e.g.*, *Miller v. William Chevrolet/GEO, Inc.*, 326 Ill. App. 3d 642, 651 (2001) ("The law will not allow a person to enter into a transaction with eyes closed to material facts and then claim fraud by deceit."). Gittlitz argues that Evans and Palcek could not have relied on his purported May 7, 2007 statements because they already knew of his "double dipping" through fraudulent expense reports. He also argues that since the CFC agreement called for an independent audit to ascertain the amount of Gittlitz's embezzlement, they could not have relied on Gittlitz's statements that his fraud had involved a small amount of money.

¶ 68    There are at least two problems with Gittlitz's argument. First, Gittlitz does not address the legal principle that, where a release *between fiduciaries* is at issue, the failure to disclose material facts makes the release voidable. In that context, the party seeking rescission need not

<hr>

[3]Although not relied upon by the trial court, we agree with ICD's argument on appeal that, independent of the parties' fiduciary relationship, the CFC agreement was voidable on the basis of fraudulent inducement. "Fraud in the inducement of a contract is a defense that renders the contract voidable at the election of the injured party." *Jordan v. Knafel*, 378 Ill. App. 3d 219, 229 (2007). Rescission on this basis requires "that the representation was: (1) one of material fact; (2) made for the purpose of inducing the other party to act; (3) known to be false by the maker, or not actually believed by him on reasonable grounds to be true, but reasonably believed to be true by the other party; and (4) was relied upon by the other party to this detriment." *Id.* In this case, the factual findings made by the trial court established these elements.

- 14 -

prove justifiable reliance on the other party's failure to disclose; rather, the burden of the "duty of full disclosure of material facts" remains on the fiduciary seeking enforcement of the release. See *Cwikla*, 345 Ill. App. 3d at 33; *Golden*, 299 Ill. App. 3d at 988. In light of the undisputed fiduciary relationship here, Gittlitz cannot escape his obligation to fully disclose material information by claiming Evans and Palcek lacked justifiable reliance.

¶ 69 Moreover, although Evans and Palcek admittedly knew before May 7, 2007 that Gittlitz had submitted fraudulent expense reports, there was evidence to support the trial court's conclusion that they nonetheless relied on his false statements minimizing his fraud. Evans and Palcek testified that, had they known the full extent of the fraud, they would not have entered the CFC agreement. The court could reasonably conclude that Evans and Palcek believed that Gittlitz, their friend and business partner for many years, was sincere when he admitted some wrongdoing, expressed remorse, agreed to an audit and restitution, and told them the fraud was relatively minor and of short duration. Gittlitz's argument is, essentially, that once he admitted to any amount of wrongdoing, Evans and Palcek were precluded from relying on any other fraudulent statements or concealment. Adopting Gittlitz's position would effectively allow him to benefit from his continued deceit of his business partners and fellow shareholders when the CFC agreement was signed. Instead, we agree with the trial court that Gittlitz's misrepresentations rendered that contract voidable.

¶ 70 Furthermore, we agree with the trial court's additional conclusion that the CFC agreement could not release claims against Gittlitz with respect to the misconduct that remained concealed and unknown to Evans and Palcek. It is well settled that "a release will not be construed to include claims that were not within the contemplation of the parties." *Goodman v. Hanson*, 408 Ill. App. 3d 285, 292 (2011). The trial court recognized that prior to entry of the CFC agreement in May 2007, Gittlitz had "restricted the financial information" disclosed to Evans and Palcek "to the two-month period of January and February of 2007." The trial testimony was uncontroverted that Gittlitz had not yet disclosed that his fraud was much larger than Gittlitz had led his business partners to believe. Thus, the trial court correctly recognized that the purported general release in the CFC agreement "did not encompass [Gittlitz's] embezzlement that was 'unknown' to, and concealed from, Evans and Palcek."

¶ 71 We next address Gittlitz's contention that ICD's repurchase of his stock pursuant to the terms of the shareholders agreement is unenforceable. He asserts that the trial court's August 17, 2012 order erred in determining that the shareholders agreement governed ICD's claim seeking specific performance. Rather, Gittlitz argues the governing contract was the employment agreement between Gittlitz and ICD dated June 1, 1998 (employment agreement), which provides that if Gittlitz's employment is terminated, ICD has the right to repurchase stock based upon the market value of the company, rather than "book value" as stated in the shareholders agreement.[4]

¶ 72 The employment agreement specified that its term would end on May 31, 2001, unless renewed by mutual agreement of ICD and Gittlitz. An ICD corporate resolution in March 2001 extended the term of the employment agreement by an additional two years. Because the employment agreement was renewed through May 31, 2003, and the shareholders agreement

---

[4] Gittlitz's employment agreement provides that the repurchase price is to be calculated by multiplying the "Market Value of the Company" by the "Repurchase Fraction," "the numerator of which is the number of shares of common stock designated in the Repurchase notice and the denominator of which is the number of shares of Common Stock outstanding."

was entered on May 20, 2003, Gittlitz claims that the employment agreement "trumped chronologically the earlier *** Shareholders Agreement by date."

¶ 73    Gittlitz's interpretation is erroneous. The corporate resolution of 2001 called for extension of the employment agreement through May 31, 2003. However, the shareholders agreement–executed in May 2003, over two years *after* the 2001 resolution concerning the employment agreement–specified that it "supersedes and replaces any and all agreements, whether written or oral, among the parties hereto pertaining to the subject matter hereof." In fact, the shareholders agreement explicitly states: "The parties hereto hereby terminate and fully release each other from all claims, known or unknown, that they may have against one another under the terms of *** *those provisions in any Shareholder's employment agreement pertaining to the repurchase of Shares* upon certain events and any other agreements relating to the subject matter hereof." (Emphasis added.) Our court has recognized that an "integration clause that purports to supersede" prior agreements on the same subject matter "is strong evidence of the parties' intent, not only to be bound by the agreement, but to have it override conflicting provisions that may have been contained in previous or contemporaneous dealings between the parties." *Midwest Builder Distributing, Inc. v. Lord & Essex, Inc.*, 383 Ill. App. 3d 645, 662 (2007). Thus, the shareholders agreement expressly superseded the terms of the employment agreement regarding repurchase of Gittlitz's ICD stock.

¶ 74    In any event, the employment agreement, even as extended by corporate resolution, explicitly expired on May 31, 2003, long before Gittlitz's 2007 termination. In contrast, the shareholders agreement does not set an expiration date, but provides that it "may be terminated or *** modified only by written instrument signed by the parties hereto." Gittlitz does not contend that the shareholders agreement was ever terminated or that its relevant provisions were modified. Thus, the trial court correctly concluded that the shareholders agreement governed.

¶ 75    The trial court also correctly rejected Gittlitz's affirmative defense that the repurchase provision of the shareholders agreement constituted an unenforceable penalty. Gittlitz argues that ICD's repurchase of his shares at "book value" (which the parties do not dispute is essentially zero) would constitute a penalty since the actual market value of ICD is several million dollars. Gittlitz argues: "The stock-buyout provision at book value for any alleged misconduct renders the provision a penalty because the damages caused by the breach could be de minimis and yet the company would be seeking a forfeiture of millions of dollars in stock."

¶ 76    This affirmative defense is simply inapplicable, as the concept of an unenforceable penalty arises in the context of contract provisions designating damages for breach. Our court has explained: "Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty." *Grossinger Motorcorp, Inc. v. American National Bank & Trust Co.*, 240 Ill. App. 3d 737, 749 (1992) (quoting Restatement (Second) of Contracts § 356 (1979)). "The determination of whether a contractual provision for damages is a valid liquidated damages provision or a penalty clause is a question of law." *Id.*

¶ 77    We do not agree with Gittlitz's position that the stock repurchase provision at issue is in reality a penalty for breach. The agreement does not suggest that ICD's right to repurchase upon termination of employment relates to a "breach" of the shareholders agreement. Rather, the provision is triggered "in the event that any Shareholder ceases to be an employee of the

Corporation *** whether voluntarily or involuntarily, by reason of a Termination with Good Cause or voluntary termination of employment by the Shareholder."

¶ 78 Moreover, Gittlitz does not cite any authorities construing stock repurchase options as unenforceable penalties. Rather, such restrictions on transfer are recognized as common, enforceable terms within a closed corporation. "A shareholders agreement is a contractual arrangement in which the shareholders agree *** not to transfer or sell their stock to outsiders without first giving the shareholders or the corporation the opportunity to purchase their shares." *Grandon v. Amcore Trust Co.*, 225 Ill. App. 3d 630, 633 (1992). In *Grandon*, this court explained that such transfer restrictions "usually require that upon the withdrawal or death of a stockholder, his or her shares will be sold or transferred only to the remaining stockholders or to the corporation ***. [Citation.] Such agreements usually contain a provision on the price at which the stock will be sold. This is true because there is generally no easy way in a close corporation to ascertain the stock's fair market value." *Id.*; see also *Warren Chevrolet, Inc. v. Bemis*, 197 Ill. App. 3d 680, 681 (1990) (affirming specific performance of contract permitting auto dealership to repurchase former employee's shares at "book value"). Thus, we agree with the trial court that the stock repurchase option in the shareholders agreement was not a penalty, but was an enforceable, bargained-for term agreed to by Gittlitz.

¶ 79 Gittlitz separately argues that ICD "is foreclosed from obtaining both monetary damages and a buyout of Gittlitz's ICD stock under the Election of Remedies Doctrine," arguing "that these are two different remedies for the same alleged breach." Gittlitz argues "awarding ICD both monetary damages and forfeiture of his ICD stock violates the doctrine." The election of remedies doctrine seeks to prevent double recovery by prohibiting a plaintiff from obtaining specific performance of a contract while also recovering damages for the breach of the same contract. See *Douglas Theater Corp. v. Chicago Title & Trust Co.*, 288 Ill. App. 3d 880, 886-87 (1997) ("While a plaintiff may pursue a remedy at law for damages and alternatively seek specific performance of the contract, plaintiff cannot have it both ways. Plaintiff cannot affirm the contract, obtain specific performance and, in essence, erase the breach, yet also seek damages at law for breach of contract."). However, "[t]he doctrine of election of remedies is applicable only where a party has elected inconsistent remedies for the same injury or cause of action." (Internal quotation marks omitted.) *Hanson-Suminski v. Rohrman Midwest Motors, Inc.*, 386 Ill. App. 3d 585, 596-97 (2008).

¶ 80 In this case, the trial court correctly concluded that the election of remedies doctrine did not preclude specific performance of the shareholders agreement's stock repurchase provisions, notwithstanding the court's separate award of monetary damages. The trial court correctly recognized that the monetary award and specific performance did not constitute "two remedies for the same alleged breach." Rather, the award of monetary damages arose from Gittlitz's breach of fiduciary duty and fraud, whereas the "award of specific performance on the stock buyout provision of the Shareholders Agreement ar[ose] out of [Gittlitz's] breach of the Shareholders Agreement" in refusing to tender his shares to ICD after his termination. We agree with the trial court that these were "two remedies stem[ming] from different breaches" that were not barred by the election of remedies doctrine.

¶ 81 We next address Gittlitz's appeal from the trial court's dismissal of his counterclaim for unjust enrichment. Gittlitz asserts he is entitled to recover from ICD his share of undistributed dividends from the years 2001 to 2007, relying on alleged annual phone conversations with Evans and Palcek in which the shareholders agreed that each could withdraw his or her share of such funds at any time. The trial court found that "Gittlitz failed to prove the existence" of such

an agreement. On appeal, Gittlitz relies on his own trial testimony that through telephonic meetings, the three shareholders verbally agreed that each could withdraw his or her share of the undistributed earnings reflected on ICD's financial statements. Gittlitz's appeal further asserts that Palcek's conflicting trial testimony was "disingenuous," that Palcek "mis-testified about ICD finances," and that Palcek "testified incorrectly that one shareholder could not overrule the other two and ask for large dividend payouts."

¶ 82     Thus, Gittlitz's appeal simply challenges the trial court's finding of fact, after hearing conflicting witness testimony, as to whether the alleged agreement was reached. "[I]t is for the trial judge to determine the credibility of the witnesses, to weigh the evidence and draw reasonable inferences therefrom, and to resolve any conflict in the evidentiary record." *Dowd & Dowd, Ltd. v. Gleason*, 352 Ill. App. 3d 365, 376 (2004). "It is not the role of this court to substitute our judgment for that of the circuit court on credibility determinations." *Staes & Scallan, P.C.*, 2012 IL App (1st) 112974, ¶ 37. Here, the trial court determined that Gittlitz lacked credibility when he described the purported verbal arrangement, while it credited Palcek's testimony denying the alleged agreement. We will not second-guess that factual finding.

¶ 83     Moreover, we note that, as Gittlitz premised his unjust enrichment claim on a purported verbal contract among the ICD shareholders, the theory of unjust enrichment would be inapplicable. "Because it is an equitable remedy, unjust enrichment is only available when there is no adequate remedy at law. [Citation.] In other words, [w]here there is a specific contract that governs the relationship of the parties, the doctrine of unjust enrichment has no application." (Internal quotation marks omitted.) *Guinn v. Hoskins Chevrolet*, 361 Ill. App. 3d 575, 604 (2005); *Gagnon v. Schickel*, 2012 IL App (1st) 120645, ¶ 25 ("This theory is inapplicable where an express contract, oral or written, governs the parties' relationship.").

¶ 84     Apart from the court's determinations at trial, Gittlitz's appeal also challenges the earlier July 3, 2012 order dismissing his claim that ICD violated his right as a shareholder to inspect its corporate books and records. Gittlitz claims that ICD wrongfully denied him access in 2007, after he had been terminated from the company and was informed of ICD's intent to repurchase his shares. On appeal, he states he "had a proper purpose to see in 2007 ICD's books and records prior to the September 10, 2007 meeting" at which the closing of the stock transfer was to occur.

¶ 85     As this claim was dismissed upon a motion for summary judgment, our standard of review is *de novo*. *General Casualty Insurance Co. v. Lacey*, 199 Ill. 2d 281, 284 (2002). "If the plaintiff fails to establish any element of the cause of action, summary judgment for the defendant is proper." *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 163 (2007). "[W]e may affirm a grant of summary judgment on any basis appearing in the record, regardless of whether the lower courts relied upon that ground." *Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 305 (2005).

¶ 86     The Business Corporation Act of 1983 provides: "Any person who is a shareholder of record shall have the right to examine, in person or by agent, at any reasonable time or times, the corporation's books and records *** but only for a proper purpose." 805 ILCS 5/7.75(b) (West 2012). "A proper purpose is shown when a shareholder has an honest motive, is acting in good faith, and seeks to protect the interest of the corporation." *Corwin v. Abbott Laboratories*, 353 Ill. App. 3d 848, 851 (2004). In other words, "a proper purpose is one which seeks to protect the interest of the corporation as well as the interest of the shareholder." *Logal v. Inland Steel Industries, Inc.*, 209 Ill. App. 3d 304, 307-08 (1991).

¶ 87    In this case, Gittlitz cannot establish that he sought inspection for a "proper purpose." ICD denied him access only after his July 2007 termination for cause, which arose from his admitted embezzlement from the corporation, and after he had been notified of ICD's intent to force him to transfer his stock to the company. Gittlitz claims his proper purpose was to prepare for the scheduled transfer of his shares back to the company. Yet, that would not establish that Gittlitz was acting in ICD's interest, as ICD sought to enforce his involuntary transfer of stock pursuant to Gittlitz's termination for cause. At that point, Gittlitz's interests were adverse to, rather than aligned with, ICD with respect to the transaction. Moreover, at the time of his request, ICD had already instituted this lawsuit against Gittlitz for breach of fiduciary duty and fraud. We thus agree with ICD's argument that Gittlitz did not seek the records due to an "honest motive" in the interest of the corporation, but did so to serve his own interests as a litigant adverse to ICD. Thus, the dismissal of Gittlitz's shareholder inspection claim was proper.

¶ 88    Next, we briefly address Gittlitz's claim that the trial court erred when it denied his emergency motion of July 10, 2013 seeking a postponement of trial for the stated reason that flying would worsen his lymphedema. "It is well-settled that litigants do not have an absolute right to a continuance; rather the decision to grant or deny a motion for a continuance is within the sound discretion of the trial court [citations] and will not be disturbed on appeal unless it has resulted in a palpable injustice or constitutes a manifest abuse of discretion." *Wine v. Bauerfreund*, 155 Ill. App. 3d 19, 22 (1987). "Once the case reaches the trial stage, the party seeking a continuance must provide the court with especially grave reasons for the continuance because of the potential inconvenience to the witnesses, the parties, and the court." (Internal quotation marks omitted.) *K&K Iron Works, Inc. v. Marc Realty, LLC*, 2014 IL App (1st) 133688, ¶ 23. In this case, we certainly cannot say that denial of Gittlitz's request for a continuance was unreasonable or an abuse of discretion. Notably, Gittlitz's motion specified only that he would have difficulty if he traveled by plane from New York to Chicago for trial; he did not assert that he could not travel by other means. In any event, Gittlitz appeared at trial and testified extensively on his own behalf. Thus, there is no indication that Gittlitz suffered prejudice from denial of the continuance.

¶ 89    Gittlitz similarly argues, without basis in the record, that the trial court's assessment of his lack of credibility was affected by the fact that he suffered a stroke in 2009 that "permanently affected his speech patterns, making it difficult for him to retrieve words, recall events, and express himself as he normally would." Although the trial court noted it found Gittlitz's testimony "evasive" and that Gittlitz had "a difficult time admitting to things which should have been routine," there is no indication that any speech or medical condition precluded him from testifying coherently or affected the court's assessment of his lack of credibility. To the contrary, the trial transcript confirms that Gittlitz repeatedly offered evasive responses before admitting to the extent of his misconduct.

¶ 90    Finally, Gittlitz complains that the content of the September 27, 2013 order is substantially identical to the initial posttrial order of September 20, 2013, which had stated that Gittlitz failed to file a posttrial brief. After Gittlitz filed an emergency motion, the court vacated that order and issued a new order, explaining that it had vacated the first order "so that it could consider the arguments made in [Gittlitz's] post-trial brief."

¶ 91    We reject the suggestion of error due to the similarity of the trial court's findings in these two orders. The trial court did not deny Gittlitz the opportunity to present its arguments, but actually granted the relief sought by Gittlitz's emergency motion by vacating the first order

and issuing a new opinion only after consideration of Gittlitz's posttrial submission. The mere fact that the court reached identical legal conclusions does not imply that the court did not give fair consideration to Gittlitz's posttrial arguments, and we will not infer error on this basis.

¶ 92          For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 93          Affirmed.