2021 IL App (2d) 200209-U
No. 2-20-0209
Order filed October 12, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| BRYAN E. BARUS, Trustee of the Bryan E. Barus Living Trust dated 01/02/02, derivatively on behalf of himself and on behalf of ROC/Suburban Naperville, LLC, | ) ) ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellant/Cross-Appellee, | ) ) | |
| v. | ) ) ) | Nos. 11-CH-5137 18-L-1104 18-AR-1413 |
| MICHAEL SIUREK and MICHAEL S. SIUREK, Trustee of the Michael S. Siurek Living Trust dated 09/30/02, | ) ) ) ) ) | Honorable Paul M. Fullerton, |
| Defendant-Appellee/Cross-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Presiding Justice Bridges and Justice McLaren concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's determination that both parties breached their fiduciary duty was not against the manifest weight of the evidence. The trial court did not abuse its discretion in determining the appropriate remedies for the parties' breach of fiduciary duty.

¶ 2    In 2011, Bryan Barus, as trustee of the Barus Living Trust, filed a complaint seeking to dissociate Michael Siurek, as trustee of the Siurek Living Trust, as a member of ROC/Suburban

Naperville, LLC (RSN), and for a finding that Siurek breached RSN's operating agreement and his fiduciary duty as a managing member of RSN. In 2017, Siurek filed a counterclaim, seeking the same relief but against Barus. By the time of trial in 2019, RSN's sole asset was sold, and the only issues related to whether either party breached their fiduciary duty, the appropriate remedy for a breach of that duty, and a determination of RSN's total assets remaining for distribution. Following a bench trial, the trial court entered an order finding that both Barus and Siurek breached their fiduciary duties, assigning appropriate remedies, and calculating the amount of RSN's total remaining assets. Barus filed an appeal, and Siurek filed a cross-appeal, from this order. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      Barus was the sole owner of Suburban Real Estate Services, Inc. (RES), a commercial real estate management company. Siurek was the sole owner of ROC, Inc. (ROC), a company also specializing in commercial real estate investments. In 2006, RES and ROC formed multiple new LLCs, including ROC/Suburban, LLC; RSN; and ROC/Suburban Two Woodland, LLC (RSTW).

¶ 5      RSN's sole asset was a commercial office building located at 1804 N. Naper Boulevard in Naperville (the Naperville building). The property consisted of an approximately 54,109-square-foot building on 2.65 acres of land. The property was acquired in November 2006 for a purchase price of $4,850,000. RSN was managed by Barus and Siurek. The operating agreement specified that the managers could not act unilaterally. The class A members of RSN were the respective trusts of Barus and Siurek. There were multiple class B members/investors. Siurek, through ROC, maintained the records and accounts of RSN, collected rents from the Naperville building, and was responsible for the finances and the physical condition the building. Barus, through RES, managed the building and was responsible for finding tenants. In addition to RSN, Barus and Suirek's trusts

owned RSTW and its sole asset was a commercial office building at Two Woodland Circle in Lisle. Barus and Siurek were also class A members and managers of RSTW.

¶ 6    In October 2011, Suite 460 at the Naperville building was vacant. The prior tenant had paid a base monthly rent of $3561. In October 2011, ROC was obligated to move out of an office suite ROC occupied in the Two Woodland building. In November 2011, ROC moved into Suite 460 in the Naperville building and, over Barus's objection, did not sign a lease or initially pay any rent to RSN.

¶ 7                              A. Barus's Complaint

¶ 8    On October 27, 2011, prior to ROC taking possession of Suite 460, Barus filed this suit against Siurek. In the initial complaint, Barus sought to have Siurek's trust dissociated as a member of RSN (see 805 ILCS 180/35-45 (West 2010)), or, alternatively, the appointment of a receiver to resolve the deadlock between the partners (see 735 ILCS 5/2-415 (West 2010)).

¶ 9    On September 14, 2016, Barus filed a second amended complaint, which alleged as follows. RSN's operating agreement did not allow for a manager to make unilateral decisions. On October 21, 2011, RSN entered into a letter of intent (LOI) to lease Suite 460 at the Naperville building to Sunny Direct, LLC, for about $3400 per month. After Sunny Direct signed the LOI, Siurek sent an email to the real estate broker for RSN informing the broker that "[o]wnership has decided to occupy Suite 460." Thus, Siurek unilaterally terminated the prospective tenancy of Sunny Direct and halted the preparation and execution of a lease. Immediately thereafter, Siurek moved ROC into Suite 460 without a lease. Barus objected to not pursuing the Sunny Direct lease and to ROC occupying Suite 460 without a lease and rent-free. ROC paid nothing for its occupancy from November 11, 2011, through June 1, 2012. RSN lost about $122,500 in revenue for the three-year Sunny Direct lease and lost the opportunity to renew the lease upon its expiration.

¶ 10   Hinsdale Bank & Trust (the Bank) was the mortgage holder of the Naperville building, and it was in the process of a second extension on the loan.  The Bank required all occupants to have a written lease.  Seven months after ROC moved into Suite 460, Siurek unilaterally prepared and executed a written lease between RSN and ROC, effective June 1, 2012.  RSN never authorized ROC to enter into the lease.  The lease was never shown to Barus, who co-managed RSN, and it was not approved by Barus.  Additionally, no corporate resolution authorized ROC to enter into the lease.  Barus received a copy of the ROC lease from the Bank.  Thereafter, Barus again directed Siurek to remove ROC from Suite 460, but Siurek refused.  The Bank threatened to declare the loan in default.

¶ 11   The complaint further alleged that Siurek paid the legal fees for some of the class B members to file a petition to intervene and to appoint a tiebreaker, in the hopes that it would force Barus to dismiss the suit and agree to the ROC lease.  The intervenors' request to appoint a tiebreaker was ultimately withdrawn but the trial court ordered RSN to pay the attorney fees incurred by the class B members but not to repay any attorney fees paid by Siurek.  The class B members represented that they paid about $41,251 in attorney fees.

¶ 12   The Bank later agreed to extend the loan despite ROC's unauthorized possession and the lack of a valid lease, but it increased the interest due.  The complaint alleged that RSN incurred an additional $356,751 in interest on the loan through August 2016 and had to pay an additional $25,000 for the Bank's attorney fees related to the loan renewal.

¶ 13   The complaint further alleged that despite entering into the lease in June 2012, Siurek did not have ROC pay the purported monthly rent between June and October 2012.  ROC started paying rent in November 2012, after the Bank questioned the non-payment of the rent.  However,

ROC stopped making rent payments from July 2013 through January 2014, based on the assertion that RSN owed ROC construction management fees.

¶ 14    On October 30, 2013, the circuit court of Du Page County, over Siurek's objection, granted Barus the authority to pursue a forcible entry and detainer action against ROC (the eviction suit). Barus, on behalf of RSN, could not otherwise have initiated the action without Siurek's approval, as the operating agreement did not allow him to act unilaterally on behalf of RSN. On November 24, 2015, the trial court in the eviction suit (Judge Bonnie Wheaton) found that there was not a valid lease and entered judgment of possession in RSN's favor. Judge Wheaton also found that RSN had been paid $85,767 less than the fair market value in rent during ROC's occupancy and entered judgment against ROC in that amount. ROC paid the judgment amount but also filed an appeal. On appeal, this court affirmed the trial court's judgment. *ROC/Suburban Naperville, LLC v. ROC, Inc.*, 2017 IL App (2d) 160203-U, ¶ 40. The complaint alleged that RSN had incurred legal fees and costs to pursue the eviction suit and defend the related appeal.

¶ 15    In summary, the complaint alleged that Siurek's conduct, in failing to complete the Sunny Direct lease, moving ROC into Suite 460 without a lease and rent-free, refusing to vacate when the Bank asserted a breach of the mortgage, unilaterally executing ROC's lease and representing to the Bank that the lease was valid, and refusing to vacate the premises after Judge Wheaton declared the lease invalid, was a sufficient basis to dissociate Siurek pursuant to section 35-45 of the Limited Liability Company Act (Act) (805 ILCS 180/35-45 (West 2014)). The complaint alleged that the same conduct breached both RSN's operating agreement and Siurek's duties as a fiduciary. Barus alleged that Siurek's conduct cost RSN in excess of $356,750 in additional interest, $25,000 in attorney fees for the Bank to renew the lease, over $64,000 in attorney fees to pursue the eviction suit, and $41,251 in attorney fees for the class B members to intervene.

¶ 16                    B. Siurek's Counter-Complaint

¶ 17    On April 27, 2017, Siurek filed an amended counterclaim, alleging as follows. In 2010, Barus, through RES, wrongfully seized and diverted the assets of ROC/Suburban, causing it to cease business. ROC subsequently initiated a suit against Barus (the 2010 suit). Thereafter, Barus began to engage in a course of conduct to coerce Siurek to dismiss the claims against him. In 2011, the trial court in ROC's suit against Barus dissolved ROC/Suburban.

¶ 18    Prior to ROC/Suburban's dissolution, ROC, RES, and RSN occupied an office together at the Two Woodland building. After the dissolution, Siurek and ROC moved to a different office space in the Two Woodland building. Barus and RES continued to occupy the original space at Two Woodland without a lease and rent-free. As Barus found tenants for the spaces that Siurek and ROC were occupying at Two Woodland, Siurek and ROC would relocate and did so several times. In order to accommodate another prospective tenant at Two Woodland, Siurek and ROC gave Barus notice of their intent to move to Suite 460 at the Naperville building. Barus then proposed a potential tenant for that space, Sunny Direct. However, there were no other spaces in buildings owned and managed by Barus and Siurek where Siurek and ROC could move. Siurek thus informed Barus that Suite 460 was not available for lease as ROC had decided to occupy the space and use it in part for managing the building.

¶ 19    The counter-complaint further alleged that Barus then retaliated by filing the present suit. Barus knew at the time that the mortgage on the Naperville building was up for renewal and that the litigation would jeopardize the loan renewal. After ROC and Siurek moved into Suite 460, Barus refused to negotiate a lease or come to any agreement for ROC's possession of the premises. The Bank told them that the lack of a lease could preclude any refinance of the loan. Thereafter, Siurek presented the Bank with a lease, effective June 1, 2012. Siurek used the fair market rent

value of the space adjusted for the savings of tenant buildout costs, rent abatements, leasing commissions and other typical costs that would be incurred. The counter-complaint alleged that Barus was presented with the lease on May 15, 2012, but that he refused to approve it. Barus's refusal was a tactic to coerce Siurek to withdraw ROC's claims in the 2010 suit. The class B members ultimately moved to intervene to coerce Barus to enter a lease with ROC. The Bank ultimately agreed to extend the loan but at a higher interest rate. The counter-complaint alleged that it was Barus's wrongful conduct that resulted in additional interest and attorney fees for class B members to intervene.

¶ 20    The counter-complaint further alleged that, thereafter, Barus signed a lease for a new tenant at the Naperville building that required some construction to prepare the space for rental. Barus knew that there were insufficient funds to pay for the construction management services for the build out. ROC provided the construction management services but Barus refused to allow RSN to pay ROC for its services. ROC took a rent credit for the amount owed, applying it to ROC's June 2013 to January 2014 rent.

¶ 21    In June 2015, the trial court resolved the August 2010 suit and entered judgment in favor of ROC and against Barus in the amount of $324,942. In December 2015, Barus and Siurek agreed to list the Naperville building for sale. The counter-complaint alleged that Barus caused RSN to incur in more than $100,000 in legal fees and costs related to the eviction suit and that Barus unilaterally executed checks for vendor invoices, including payments to his attorneys in the eviction suit. Siurek's counter-complaint sought to have Barus dissociated as a member pursuant to the Act and to find him in breach of RSN's operating agreement and his fiduciary duties to RSN.

¶ 22                    C. Partial Summary Judgment and Trial

¶ 23   On June 21, 2017, Barus filed a motion for summary judgment on his complaint, arguing that there was no genuine issue of material fact that Siurek breached the operating agreement and his fiduciary duties. On November 7, 2017, the trial court granted Barus' motion for summary judgment in part and denied it in part. The trial court noted that, in the eviction suit, Judge Wheaton found that the lease was invalid because Siurek had entered it unilaterally. The trial court found that this was a breach of the operating agreement. The trial court thus granted partial summary judgment against Siurek for the $99.978.90 in attorney fees incurred by RSN for the eviction suit. The trial court also entered partial summary judgment against Siurek for the $41,251 in attorney fees incurred by the class B members to intervene in this suit. The trial court found those fees directly related to Siurek's breach of contract and breach of fiduciary duty with respect to the actions at issue in the eviction suit. Additional questions remained regarding damages for the additional interest on the bank loan and management fees owed to Barus and/or Siurek.

¶ 24   Case Nos. 18-L-1104 and 18-AR-1413 were consolidated with the present case prior to trial. In case No. 18-L-1104, ROC filed suit against RSN to recover construction management fees and fees for use of Suite 460 as an office of the building. ROC had raised this argument on appeal in the eviction suit, but this court found the argument forfeited. See *ROC/Suburban Naperville*, 2017 IL App (2d) 160203-U, ¶ 38. Accordingly, RSN moved to dismiss the complaint in case No. 18-L-1104 on the bases of *res judicata* and collateral estoppel. On March 18, 2019, the trial court granted the motion and dismissed the case with prejudice. In case No. 18-AR-1413, RES filed suit against RSN for breach of contract. RES alleged that it had provided management services and maintenance services for which it had not been paid. RES also alleged that it was owed a commission on a renewal lease that it had procured for RSN. RES requested that RSN be ordered to pay RES for the services and commission.

¶ 25    A bench trial was held over eight days in April and May 2019.  At trial, Doug Riccolo testified that he was a class B investor/member of RSN.  When he found out that ROC/Suburban was dissolved, he was worried about RSN and the refinancing of its mortgage.  He was specifically worried about the ability to get a return on his investment.  He knew that the mortgage was not paid in June 2012 and that Barus had not signed a 90-day extension offered by the Bank.  That was when he decided to consult an attorney.  He found and contacted the attorney who represented the intervenors, who were all of the class B members.  He did not have the money for a down payment so he asked Siurek if ROC could advance the money for the security deposit and retainer.  The reason he started that intervention was because he wanted the property to be refinanced.  He did not want a receiver.  Riccolo acknowledged that the loan was eventually refinanced in December 2012.  Riccolo further testified that it was common practice for ROC to occupy an office in the buildings that it managed.  He did not file the intervenor suit to force ROC to pay rent to RSN.

¶ 26    Mark Hale testified that he was an executive vice president at the Bank.  He was the relationship/loan manager with RSN in 2011 and 2012.  The fact that Barus filed a suit against Siurek was a big concern because two co-guarantors on the loan were not getting along.  The Bank's desire was to have the litigation dismissed.   He did not recall Barus ever sending him a proposed lease for ROC's possession of Unit 460, but Siurek had sent him one.  If Barus had approved Siurek's proposed lease, the Bank would have approved it.  The cash flow from the lease would have helped with the debt service and contributed to the net operating income of the building. Further, any potential buyer of the building would have viewed Siurek's lease as an asset of the building.  Onsite management was generally considered positive.  Barus told Hale he rejected the lease because of its terms.  Barus mentioned that the Siurek lease did not have a commission in it.  Hale did not recall any discussion about rent being less than fair market value

or the lease not providing for back rent. He did recall Barus indicating that he would accept a 39-month lease instead of a month-to-month lease.

¶ 27 Barus testified that whenever RES used an office, it paid rent. RES had an office in Two Woodland but moved out about March 2011. RES moved to a building that was not owned by RSN or RSTW. Barus acknowledged that it would have been a benefit to the LLCs had RES remained in the Naperville or Two Woodland building.

¶ 28 Barus further testified that, in 2011, ROC was occupying Suite 100 at the Two Woodland building. However, in September 2011, a new tenant, Augmentity, entered a letter of intent to move into that space. At that point, ROC could have moved into Suite 300 at Two Woodland, rather than Suite 460 in Naperville. Barus, as a landlord broker, had signed an LOI with another potential tenant, Sunny Direct, to occupy Suite 460. Despite the LOI, Siurek moved into suite 460 in November 2011 without Barus's agreement as co-manager, in violation of RSN's operating agreement. When Barus asked Siurek how much ROC would pay in rent for Suite 460, Siurek said ROC would pay no rent. ROC was the only tenant in the Naperville building that did not have a lease. ROC did not start paying rent until December 2012. Barus acknowledged that, as a co-manager, Siurek had the right to reject the Sunny Direct lease.

¶ 29 Barus testified that when he filed suit in 2011, he knew RSN's bank loan was up for renewal. Barus acknowledged that, in the lawsuit, he did not seek an injunction to prevent ROC from moving into Suite 460. Barus acknowledged that he may have had discussions with the Bank about the lawsuit. He did not recall if RSN's mortgage required all tenants to have a lease. He believed that, because of the pending litigation, this was the first time the Bank required lease agreements to be approved by the Bank. Barus knew the Bank wanted the litigation to end.

However, he did not want to drop the suit because he had already incurred significant legal expenses and had a duty to RSN and its investors.

¶ 30    Barus further testified that when Naperville's loan was up for renewal in June 2012, the Bank raised the issue of ROC having no lease.  In June 2012 he was willing to sign a lease with ROC that was comparable to the lease Sunny Direct would have signed.  Siurek had proposed a lease, but Barus rejected it because it was not as favorable as the Sunny Direct lease would have been.  Barus wanted ROC to sign a 39-month lease even though he was seeking to have Siurek dissociated from RSN.  Barus acknowledged this was a catch-22 for Siurek.  Barus acknowledged that, at some point during the lease negotiations, Siurek had offered to pledge his economic interest in RSN as security for any rent that was due.  Barus acknowledged that when the loan matured on June 5, 2012, he did not agree right away to a 90-day extension.  Barus acknowledged that he did not sign the extension until August 27, 2012, near the end of the extension period.  Barus knew Siurek had a long-standing relationship with the Bank and that Siurek had a lot to lose if the loan defaulted.  Barus denied pushing things with the loan to harm Siurek.

¶ 31    Barus testified that, in 2014, he received permission to file the eviction suit.  Barus believed it was in RSN's best interest to file the eviction suit.  Barus acknowledged that if ROC had been evicted, there was no replacement tenant to step in and start paying rent.  Barus acknowledged that at the time he filed the eviction suit, ROC was paying $15 per square foot in rent.  In the absence of ROC's rent, the value of the building decreased significantly.  Additionally, there were other vacancies at the time.  Barus testified that honesty and truth was more important than maximizing the sale price of the building.  Barus testified that the Naperville building was sold in December 2016.

¶ 32    Siurek testified that he and Barus formed ROC/Suburban in 2006. The first building they purchased together was 4300 Commerce in Lisle. After the purchase they both moved their offices into the property. They paid rent because they had assumed the note and mortgage and there was a requirement to produce a lease for space in the building. However, the rent paid was discounted from what was written in the lease. While they paid rent, they also invoiced the building for office of the building and other expenses, so it was essentially a wash.

¶ 33    ROC/Suburban relocated when it purchased the Two Woodland building. They also had a lease, which was below market value, and there was a setoff for office of the building. He believed it was a benefit to the building and the investors to have an office of the building. It was common practice to have a management office in the buildings that he and Barus owned. They would use the office until the building was mostly leased, and then they would move to a different location. They would not always pay rent for use of the space.

¶ 34    Siurek further testified that in June 2010, Barus slid a letter under his door at the end of the day. The letter indicated Barus was no longer happy with ROC/Suburban, that he was going to take it over, and it listed a host of changes and actions he was planning to take. This made the investors uneasy and spurred the 2010 suit. ROC/Suburban was dissolved in January 2011. After Barus' letter, Siurek moved ROC's office to the other side of the Two Woodland building (Suite 100). RES stayed in the building until April 2011, when it moved back to the Commerce building.

¶ 35    Siurek testified that the Naperville building was acquired in 2006. In September 2011, Barus found a tenant, Augmentity, for Suite 100 at Two Woodland. Siurek was willing to relocate to the smallest suite at the Naperville building, which was Suite 460. It had just become vacant. Siurek moved in November 2011. He had to move right away because Augmentity wanted to move in quickly and RSN still had to do a buildout. The Augmentity lease was big for Two

Woodland, about $100,000 per year. Siurek testified that he did not agree to the Sunny Direct LOI, and he never saw its financials. He did not intend to occupy Suite 460 rent-free. Siurek believed he was acting in the best interest of RSN when he moved to Suite 460. He was making room for Augmentity at Two Woodland and Suite 460 was the smallest space available. It was valuable to have an office of the building in the Naperville building.

¶ 36    Siurek testified that, in November or December 2011, he asked one of the class B members, Mark Grunze, to do an analysis of the Sunny Direct LOI to determine an appropriate rent for Suite 460. Siurek and Barus had discussed $15 a square foot. Siurek met with Barus and the Bank in April 2012 because the loan was coming due in June. The Bank stated that the lawsuit was an impediment to a refinance. An ROC lease was not discussed at the meeting. It was not until April 2012 that the Bank mentioned that all occupants of the Naperville building had to have a lease. Siurek sent the Bank a lease in mid-May. The lease was for $15 per square foot, with rent to commence June 2012. The reason he had not paid rent earlier was because he and Barus could not agree on a number.

¶ 37    Siurek testified that RSN's mortgage loan was due June 5, 2012. He was concerned when that date passed and there was no extension or renewal. By the end of June, class B members, Riccolo and Grunze, were concerned and wanted to speak to an attorney. Siurek provided them with a check, from ROC, to facilitate their meeting with an attorney. Siurek did not direct them to any specific attorney. On August 6, 2012, Barus's lawsuit was dismissed with leave to replead. On August 27, 2012, Barus signed a loan modification agreement.

¶ 38    Siurek noted that, on September 4, 2012, Barus filed an amended complaint. Siurek believed this would cause a setback in trying to get subsequent refinancing with the bank. On October 18, 2012, Siurek learned that any further refinancing would include additional interest

because of what the Bank called two "unacceptable conditions": the lawsuit and ROC's lack of a lease. After that, Siurek tried to negotiate a lease with Barus. He had Grunze prepare a comparison of the Sunny Direct and the ROC proposed leases. The analysis showed that the ROC lease was more profitable over 39 months than the Sunny Direct proposed lease. However, Siurek did not want to sign a 39-month lease when Barus was trying to dissociate him from the LLC or appoint a receiver. However, as the matter was pending in the eviction suit at that time, he was willing to pay back rent and pledge his security in the building as a demonstration of good faith. Barus still refused to accept his lease.

¶ 39   In November 2012, Siurek filed a counterclaim in the lawsuit, in the hopes that it would induce Barus to drop the suit. On December 5, 2012, Hale sent an email to Barus letting him know that if there was no agreement as to loan modification soon, then it was possible Hale would lose control of the status of the loan and it would be taken over by the Bank's attorneys. Barus and Siurek both signed a loan modification agreement that day. Siurek testified that it was not in the best interest of RSN to push the loan agreement to the brink of foreclosure. Siurek testified that he did everything he could to try to reach a lease agreement with Barus.

¶ 40   Siurek further testified that in November or December 2012, ROC started paying rent for Suite 460. Although he was not able to reach an agreement with Barus, he wanted to move forward and start doing something right. He started paying increased rent in March 2016, based on Judge Wheaton's order in the eviction suit. When the Naperville building was for sale, he had to fight with Barus to stay there and pay rent, which improved the sale price. The Naperville building was eventually sold on the condition of the new owner that ROC remain in the space and pay rent until the new owner could find another tenant. While the Bank reevaluated the unacceptable conditions every six months, Barus never agreed to a lease. After Judge Wheaton ruled in the eviction suit,

Siurek proposed a lease at the fair market value determined by Judge Wheaton. Barus still refused to sign a lease. This was about December 2015, when the building was up for another loan extension renewal.

¶ 41    Siurek testified that in 2015, he and Barus agreed to sell the Naperville building. ROC's rent increased the value of the building by $300,000. Barus did not want to include ROC rent in the net operating income of the building. Siurek testified that after the November 2015 judgment against him in the eviction suit, he did not want ROC to move out because it would have hurt the value of the building and they were trying to sell it. Suite 460 was only 4% of the building square footage.

¶ 42    Jeff Goodwin testified that he was a class B investor in RSN. He thought that the Barus litigation negatively impacted the viability of his investment. At one point, the attorney for the class B investors suggested that Goodwin be appointed as a receiver. He later declined to be appointed because he realized that the situation was contentious, and he did not think being a receiver was a good idea. He did not believe that paying additional interest on the mortgage loan for the unacceptable conditions was in the best interest of RSN. When he expressed concerns to Barus, Barus told him he was a big boy and knew there was a chance he would lose his investment. Barus told him he would get an education and maybe be a smarter investor next time. Goodwin found these comments to be callous. He did not think Barus was acting in the best interest of the class B investors. He would have preferred to just collect ROC's rent money and not pursue a costly eviction suit. Goodwin believed that Barus filed the eviction suit to gain leverage in the 2010 suit.

¶ 43    On cross-examination, Goodwin acknowledged that if ROC had intended to never pay any rent, then perhaps the eviction suit would have been warranted. In the summer of 2012, he had

voiced a preference that ROC have a lease. Goodwin believed ROC should have signed a lease that was consistent with the Sunny Direct terms. Even though Barus prevailed in the eviction suit, that did not change Goodwin's opinion that Barus was not acting properly. Goodwin believed that Barus should have entered a lease with Siurek to avoid the additional interest on the loan renewal.

¶ 44    On December 27, 2019, the trial court issued a written order. The trial court noted that the litigation between Barus and Siurek had been ongoing for eight years and that the sole issue was the division of company assets. The trial court stated that the witnesses' testimony made clear that Barus and Siurek were deadlocked on important issues and that this was detrimental to the business. The trial court found that both parties breached their fiduciary duties owed to the business and to each other. The trial court stated that the additional $384,000 in interest on the renewed loan from the Bank was the fault of both Barus and Siurek. The trial court found that while one party may have been more at fault than the other regarding unreasonable behavior, "at the end of the day each party is equally responsible for the mess."

¶ 45    The trial court found that the additional $384,203.54 in interest was due to both parties not acting in the best interest of the company and ordered that it be divided equally between them. As to management fees, the trial court found that $91,500 had already been paid to each party and that the funds did not need to be returned to the company. As to the intervenor fees of $41,251, the trial court reversed the portion of its November 2017 order, finding Siurek responsible for those fees, and instead made the fees a liability to the company (on the basis that both parties were equally at fault overall). The trial court upheld its November 2017 order to the extent it found Siurek responsible for $99,978.90 in attorney fees for the eviction suit. The trial court denied Barus' request for $56,250 for the time he spent managing the litigation. The trial court stated that the assets left for distribution should be made according to the members' class and ownership

percentage.  Finally, the trial court found that Barus and Siurek were each responsible for their own attorney fees.

¶ 46    Thereafter, Barus filed a motion for reconsideration.  In that motion, Barus requested that the trial court order that RSN pay the attorney fees that RSN incurred in moving to dismiss case No. 18-L-1104.  Alternatively, Barus requested that the trial court grant his motion for sanctions so that RSN could recover its legal fees and costs from the person responsible for bringing the baseless case.  Siurek filed a motion for modification, arguing that the eviction suit attorney fees should be assigned to RSN or, alternatively, should be assessed equally against himself and Barus.

¶ 47    Siurek also filed a motion to approve distribution of RSN's assets and included a distribution schedule that was consistent with the trial court's December 2019 order.  Barus filed a response, arguing that distribution was premature as there were post-judgment motions pending and the matter could still be subject to modification in the appellate court.

¶ 48    On March 9, 2020, the trial court denied Barus's motion for reconsideration, denied Siurek's motion for modification, and granted Siurek's motion for distribution.

¶ 49                                    II. ANALYSIS

¶ 50                                 A. Motion to Dismiss

¶ 51    At the outset, we note that Siurek filed a motion to dismiss this appeal which was ordered to be taken with this case.  In the motion to dismiss, Siurek argues that, because Barus accepted his distribution check and did not seek to stay the judgment, he forfeited his right to appeal the December 2019 judgment.  Further, as all of RSN's assets have been distributed, Siurek argues that this appeal is moot.

¶ 52    It is well-established that an appeal is moot when it involves no actual controversy, or the reviewing court cannot grant the complaining party effectual relief.  *Steinbrecher v. Steinbrecher*,

197 Ill. 2d 514, 527-28 (2001). Further, where supervening events make it impossible for a reviewing court to grant relief to any party, the case is rendered moot because an appellate ruling on the issue cannot have any practical legal effect on the controversy. *In re Tekela*, 202 Ill. 2d 282, 292-93 (2002). Accordingly, a reviewing court ordinarily will not decide a moot issue. *People ex rel. Sklodowski v. State*, 162 Ill. 2d 117, 130 (1994).

¶ 53    In his motion, Siurek relies on "the general rule in civil cases that when a judgment has been voluntarily paid or its benefits accepted the question becomes moot." *Cook County v. Malysa*, 39 Ill. 2d 376, 379 (1968). Siurek's reliance on *Malysa* is unpersuasive. *Malysa* involved an eminent domain judgment, which "merely establishes a value that [the condemnor] must pay to acquire title" and "[t]he condemnor is under no compulsion to pay the award." *Id.* The *Malysa* court thus held that because the condemnor voluntarily paid the award and accepted title to the property, it forfeited any contentions of error in the original proceeding. *Id.* at 381.

¶ 54    Siurek argues that this case is similar to *Malysa* in that, although the trial court approved the motion to distribute, RSN was not obligated to disburse the funds. Siurek insists that the funds were only disbursed because Barus voluntarily agreed to the disbursement. This assertion is belied by the record. Barus objected to the motion to distribute, and the trial court granted the motion to distribute over that objection. The record also indicates that Barus raised objections to distribution with Siurek post-judgment. Thus, Barus did not voluntarily agree to the subsequent disbursement; it was authorized by court order. The distribution of judgment proceeds, made over the objection of an appellant, does not render an appeal moot. *Columbia Mutual Insurance Co. v. Herrin*, 2012 IL App (5th) 100037, ¶ 11.

¶ 55    Siurek also relies on Illinois Supreme Court Rule 305(k) (eff. July 1, 2017). Siurek argues that Rule 305(k) moots the appeal because Barus failed to obtain a stay and all of RSN's assets

have been distributed. Rule 305(k) protects third-party purchasers of a property from "reversal or modification of the judgment" regarding that property if: "(1) the property passed pursuant to a final judgment; (2) the right, title and interest of the property passed to a person or entity who is not part of the proceedings; and (3) the litigating party failed to perfect stay of judgment within the time allowed for filing a notice of appeal." *Steinbrecher*, 197 Ill. 2d at 523-24 (interpreting Rule 305(j), which is now Rule 305(k)). As this case does not involve third-party purchasers, it is questionable whether this rule even applies in this case. However, even if it were applicable, we would still find Siurek's reliance on it unpersuasive because the second requirement has not been met. Here, the property passed to RSN's class A and B members. Barus and Siurek are the class A members and the class B members moved to intervene in this suit. Although the attorney representing the class B members filed a motion to withdraw, which the trial court granted, there is no indication that the class B members moved to dismiss themselves as parties. As such, the property passed to persons or entities that are part of this proceeding. To the extent any of RSN's assets were used to pay creditors, neither party raises challenges on appeal related to the recovery of any payments made to creditors. Accordingly, this appeal is not moot and Siurek's motion to dismiss the appeal is denied.

¶ 56                                    B. Motion to Strike

¶ 57    Siurek filed a motion to strike portions of Barus's reply brief, arguing that he raised new arguments and sought relief not previously requested. Specifically, Siurek argues that, in Barus's reply brief, Barus argues for the first time that Siurek should pay Barus for his time, expenses, and legal fees in pursuing this litigation rather than RSN paying Barus. This contention is without merit. In his reply brief, Barus argues that Siurek should be responsible to RSN for any fees RSN is ordered to pay Barus for his time and attorney fees. In his initial brief, Barus similarly argued

that "RSN's [o]perating [a]greement requires RSN to pay Barus for those fees, and RSN should recover those fees as damages from Siurek." Accordingly, upon review of Barus's reply brief, we conclude that no new arguments were raised, and no new relief was sought. Siurek's motion to strike is therefore denied.

¶ 58                                    C. Barus's Appeal

¶ 59    On appeal, Barus argues that the trial court erred in finding that he breached his fiduciary duty and not allowing him to recover for his time and expenses related to this suit. Barus also argues that the trial court abused its discretion in determining the appropriate remedies for Siurek's breach of fiduciary duty and erred in ordering a distribution of RSN's remaining assets without reserving funds for RSN's remaining creditors.

¶ 60    Barus first argues that the trial court erred in finding that he breached his fiduciary duty to RSN. Members in a manager-managed limited liability company owe the company and each other the fiduciary duties of loyalty and care. 805 ILCS 180/15-3(g) (West 2010) (stating that managers are held to the same standards of conduct prescribed for members in subsections (b), (c), and (d) of section 15-3 of the Act). The duty of loyalty requires a manager to account to the company and its members and to act fairly in conducting the company's business. *Id.* § 15-3(b). A manager's duty of care "is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of the law." *Id.* § 15-3(c). Moreover, a manager of a manager-managed limited liability company shall discharge his duties consistent with the obligation of good faith and fair dealing. *Id.* § 15-3(d). In the present case, the parties do not dispute that, as managers of a manager-managed LLC, they shared a fiduciary relationship and owed the company and each other the duties of loyalty, care, and good faith and fair dealing.

¶ 61    We review the trial court's determination as to the alleged breach of fiduciary duty pursuant to a manifest weight of the evidence standard of review. *Bernstein and Grazian, P.C. v. Grazian and Volpe, P. C.*, 402 Ill. App. 3d 961, 976 (2010).  Under this standard, we may only conclude that the trial court's determination was against the manifest weight of the evidence if an opposite conclusion is clearly apparent or the trial court's findings appear to be unreasonable, arbitrary, or not based on the evidence. *Id.*

¶ 62    In the present case, the trial court found that Barus, over the eight years of litigation, breached his fiduciary duty to RSN and RSN's members.  In so ruling, the trial court set forth one example of such a breach.  Specifically, the trial court found that Barus breached his fiduciary duty by allowing RSN to incur over $384,000 in additional interest from RSN's mortgage loan.  The evidence showed that the Bank charged additional interest on RSN's loan due to the pending lawsuit and because ROC did not have a lease at the time of the loan renewals.  We cannot say that the trial court's determination was against the manifest weight of the evidence.  Barus had the power to drop his lawsuit and the evidence indicates that the failure to reach an agreement on a lease was due to both parties' failure to compromise.  Additionally, the trial court noted that neither party was completely forthcoming in their testimony at trial.  It is well-established that the credibility of witnesses should be left to the trier of fact because it alone is in the position to see the witnesses, observe their demeanor, and assess the relative credibility of witnesses where there is conflicting testimony on issues of fact. *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 21.  Based on our review of the record, we find no reason to disturb the trial court's judgment.

¶ 63    Barus argues that he had a fiduciary duty to take action to prevent Siurek's breach of fiduciary duty in occupying Suite 460 and failing to pay an appropriate amount of rent.  While this may be true, he also had a fiduciary duty to RSN's other members to act in the best interest of

RSN. While ROC was not paying rent initially, by the time Barus filed the eviction suit, ROC was paying rent. Further, while Barus was able to recover about $85,000 in back rent from ROC through the eviction suit, RSN had to expend $100,000 in attorney fees and incurred $384,000 additional interest on the bank loan. Multiple members testified that these actions were not in the best interest of RSN and put their investments at risk. Further, at the time of the suit Barus could not have known that Siurek would ultimately be held responsible for the attorney fees and that he and Siurek would be personally responsible for the additional interest.

¶ 64    Barus also argues that the evidence showed that he did agree to lease terms and that it was Siurek who rejected those terms. Barus relies on an October 25, 2012, email he wrote to Siurek. Siurek's response to Barus, Siurek crossed out the proposed terms. Barus argues that this shows that he was not responsible for the failure to reach an agreement. However, Siurek testified that he crossed out these terms because the parties were still trying to reach mutually acceptable terms. For example, Barus wanted a 39-month lease. Siurek did not want to sign a 39-month lease unless Barus dropped the lawsuit because Siurek did not want to be in an extended lease if he was dissociated and a receiver was appointed. Siurek also testified that he was willing to sign a lease and pledge his economic interest in RSN to Barus if Barus would agree to sign a lease and continue to work on the terms after the bank loan was renewed. In light of this testimony, we cannot say that the trial court's determination was against the manifest weight of the evidence. Rather, it shows that the trial court gave more credit to Siurek's testimony on this issue and found that both parties were equally responsible for a failure to compromise on lease terms. Accordingly, we cannot say that the trial court's determination was unreasonable, arbitrary, or not based on the evidence.

¶ 65    Barus next argues that the damages awarded by the trial court for Siurek's breach of fiduciary duty were improper.  Generally, "when one breaches a fiduciary duty to a principal the appropriate remedy is within the equitable discretion of the court."  (Internal quotation marks omitted.)  *ICD Publications, Inc. v. Gittlitz*, 2014 IL App (1st) 133277, ¶ 53 (quoting *In re Marriage of Pagano*, 154 Ill. 2d 174, 190 (1992)).   The issue of damages is a question of fact and a trial court's finding of damages will not be disturbed on appeal unless it is against the manifest weight of the evidence.  *Fieldcrest Builders, Inc. v. Antonucci*, 311 Ill. App. 3d 597, 607 (1999).  A damage award is against the manifest weight of the evidence only where it is apparent that " 'the trial court ignored the evidence or that its measure of damages was erroneous as a matter of law.' "  *Id.* at 607 (quoting *Meade v. Kubinski*, 277 Ill. App. 3d 1014, 1018 (1996)).  "[A] fiduciary may not retain any profits obtained through a breach of duty."  *Regnery v. Meyers*, 287 Ill. App. 3d 354, 364 (1997).

¶ 66    First, Barus argues that the trial court erred by entering judgment against Siurek for only one-half of the additional interest.  Barus argues that the trial court should have apportioned all the additional interest against Siurek.  This contention is premised on the assertion that the trial court erred in finding that Barus breached his fiduciary duty to RSN.  Barus contends that, through this suit, he obtained the trial court's approval to bring the eviction suit, recovered the legal fees RSN incurred in the eviction suit, and recovered the additional interest incurred because of Siurek's misconduct.  However, as explained above, the lawsuit and the failure to reach any compromise on a lease was detrimental to RSN and its members.  There was more money spent on legal fees and additional interest on the mortgage loan than recovered in past rent.  Further, the evidence indicated that at the time Barus filed the eviction suit, ROC was paying rent and there were no other potential tenants to fill the suite.  Significantly, at the time RSN prevailed in the eviction suit,

Barus never moved to have ROC evicted. As we have affirmed the trial court's determination that Barus breached his fiduciary duty and, thus, that Barus and Siurek were equally at fault, we cannot say that the trial court erred in entering judgment for half of the additional interest against Barus.

¶ 67　Barus next argues that the trial court erred by reversing its summary judgment against Siurek for the intervenor legal fees of $41,251 and assigning that expense to RSN. Barus argues that this case and the intervention were caused by Siurek's misconduct. As explained above, we affirm the trial court's determination that both parties breached their fiduciary duty to RSN. Further, the testimony of Siurek and Goodwin indicate that, although Siurek may have provided funds to pay the intervenor attorney's retainer fee, the suit was not prompted by Siurek but was prompted by the class B members' genuine concern that Siurek's and Barus's inability to compromise was threatening their investment. Accordingly, we cannot say that assigning the intervenor attorney fees as an expense to RSN was an abuse of discretion or against the manifest weight of the evidence.

¶ 68　Barus further argues that the trial court erred in allowing Siurek to retain the management fees he earned from December 2012 until December 2016 when the property was sold. As a matter of public policy, a willful breach of a fiduciary duty generally requires forfeiture of all compensation earned during the period of the breach. *Tully v. McLean*, 409 Ill. App. 3d 659, 681 (2011). Nonetheless, the appropriate remedy for breach of a fiduciary duty is within the equitable discretion of the court. *Id.*; see also *ICD Publications*, 2014 IL App (1st) 133277, ¶ 53. We cannot say that the trial court abused its discretion in allowing Siurek to retain the management fees he earned. The record indicates that while Siurek and Barus were unable to agree on lease terms, they continued to co-manage the Naperville building, although not without conflict, until it was sold in 2016. Further, the trial court allowed Barus to retain the management fees he earned during the

relevant period even though he also breached his fiduciary duty. Finally, the trial court imposed other appropriate remedies on Siurek for the breach of his fiduciary duty, namely, the eviction suit attorney fees and half of the additional interest.

¶ 69　Barus argues that the trial court erred in denying his request to be reimbursed for his time and expenses incurred in bringing this suit. He testified that he spent between 250 to 300 hours managing the litigation and he requested about $56,000 in time and expenses. Barus argues that these amounts should be entered as damages against Siurek and awarded to RSN. Barus relies on RSN's operating agreement, which provides that RSN "shall reimburse the [m]anagers for reasonable costs advance to or paid for the benefit of [RSN]." However, the trial court found that Barus was not always acting in the best interest of RSN or its members and that Barus breached his fiduciary duty. As we have affirmed that determination, we cannot say that the trial court's determination, denying Barus the requested expenses, was erroneous.

¶ 70　Finally, Barus argues that the trial court erred by ordering a distribution of RSN's remaining assets to its members without reserving funds for RSN's remaining creditors. Barus fails to provide any authority to support this argument. Further, Barus argues that there are numerous creditor claims outstanding that precluded distribution. However, Barus fails to state who the creditors are or how much they are owed. Barus asserts only that RSN is still required to pay certain legal fees and that the trial court was aware that RSN had yet to pay these fees, but Barus fails to provide any citation to the record for this assertion. Failure to provide proper citations to the record and to relevant authority is a violation of Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020). Accordingly, this argument is forfeited. See *Mack v. Viking Ski Shop, Inc.*, 2014 IL App (1st) 130768, ¶ 17; *Engle v. Foley & Lardner, LLP*, 393 Ill. App. 3d 838, 854 (2009).

¶ 71                                    D. Siurek's Cross-Appeal

¶ 72     On cross-appeal, Siurek argues that the trial court erred in assessing all of the attorney fees in the eviction suit against him. Siurek argues that, because he and Barus both breached their fiduciary duties, the trial court should have assessed the eviction suit attorney fees equally against Barus and himself. As noted, damages for breach of fiduciary duty are within the discretion of the trial court. *Tully*, 409 Ill. App. 3d at 681. Further, whether and in what amount to award attorney fees is also within the trial court's discretion. *Thomas v. Weatherguard Construction Co.*, 2018 IL App (1st) 171238, ¶ 61. In assessing the attorney fees in the eviction suit against Siurek, the trial court noted that, in the eviction suit, it was determined that ROC occupied the premises in the absence of a valid lease and was underpaying rent. See *ROC/Suburban Naperville*, 2017 IL App (2d) 160203-U, ¶¶ 19, 40. The trial court agreed that these actions were a breach of Siurek's fiduciary duty. Based on these determinations, we cannot say the trial court abused its discretion in apportioning these fees against Siurek alone.

¶ 73                                    III. CONCLUSION

¶ 74     For the reasons stated, we affirm the judgment of the circuit court of Du Page County.

¶ 75     Affirmed.